<u>**EXHIBIT 1**</u>

**Debtor-In-Possession Credit Agreement**

EXECUTION VERSION

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of November __, 2009

by and among

EXPRESS ENERGY SERVICES OPERATING, LP,
as Borrower,

EXPRESS ENERGY SERVICES (2008) LLC,
as Holdings,

THE GUARANTORS PARTY HERETO,
as Guarantors

The Financial Institutions From Time to Time Party Hereto,
as Lenders

and

ORIX FINANCE CORP.,
as DIP Agent

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ................................................................................................. 2
    Section 1.1    Definitions.......................................................................................... 2
    Section 1.2    Construction...................................................................................... 17

ARTICLE II LOAN AND TERMS OF PAYMENT ................................................................. 18
    Section 2.1    Revolving Loans. ............................................................................ 18
    Section 2.2    Maturity. ......................................................................................... 22
    Section 2.3    Prepayments. ................................................................................... 23
    Section 2.4    Interest............................................................................................. 24
    Section 2.5    Fees. ................................................................................................ 25
    Section 2.6    Receipt of Payments. ...................................................................... 26
    Section 2.7    Application and Allocation of Payments. ....................................... 26
    Section 2.8    Indemnity. ....................................................................................... 27
    Section 2.9    Taxes. .............................................................................................. 28
    Section 2.10   Increased Costs; Illegality; Capital Adequacy. .............................. 31
    Section 2.11   Mitigation. ....................................................................................... 31
    Section 2.12   Making or Maintaining Eurodollar Rate Loans. ............................. 32
    Section 2.13   *Pro Rata* Treatment........................................................................ 33
    Section 2.14   Superpriority Nature of Obligations and Lenders' Liens. .............. 33

ARTICLE III CONDITIONS PRECEDENT ......................................................................... 36
    Section 3.1    Conditions to the Closing Date. ...................................................... 36
    Section 3.2    Conditions to All Borrowings. ........................................................ 38

ARTICLE IV REPRESENTATIONS AND WARRANTIES ..................................................... 39
    Section 4.1    Organization and Qualification........................................................ 39
    Section 4.2    Executive Offices; Collateral Locations; FEIN; Organizational Information. . 39
    Section 4.3    Authorization; Enforcement; Validity. ............................................ 39
    Section 4.4    No Conflicts..................................................................................... 40
    Section 4.5    No Default........................................................................................ 40
    Section 4.6    Consents.......................................................................................... 40
    Section 4.7    Conduct of Business; Regulatory Permits. ..................................... 41
    Section 4.8    Foreign Corrupt Practices. .............................................................. 41
    Section 4.9    Permitted Debt; Permitted Liens..................................................... 41
    Section 4.10   Litigation. ........................................................................................ 41
    Section 4.11   Insurance. ........................................................................................ 41
    Section 4.12   Employee Relations. ....................................................................... 42
    Section 4.13   Title................................................................................................. 42
    Section 4.14   Environmental Laws. ...................................................................... 42
    Section 4.15   Tax Status........................................................................................ 42
    Section 4.16   Investment Company. ..................................................................... 43
    Section 4.17   Disclosure of Information. .............................................................. 43
    Section 4.18   Employment Benefit Plans. ............................................................ 43
    Section 4.19   Margin Rules.................................................................................... 44

i

# TABLE OF CONTENTS
## (continued)

Section 4.20    Government Regulations. ................................................................... 44

ARTICLE V AFFIRMATIVE COVENANTS ........................................................ 44
Section 5.1    Financial Statements, Reports, Certificates, Etc. .............................. 44
Section 5.2    Budgets. ............................................................................................ 46
Section 5.3    Access. .............................................................................................. 46
Section 5.4    Maintenance of Properties, Licenses and Permits. .......................... 46
Section 5.5    Compliance with Laws. ..................................................................... 47
Section 5.6    Corporate Existence. ......................................................................... 47
Section 5.7    Use of Proceeds. ............................................................................... 47
Section 5.8    Disclosure Updates. .......................................................................... 47
Section 5.9    Taxes. ................................................................................................ 48
Section 5.10    Maintenance of Insurance. ............................................................... 48
Section 5.11    Further Assurances. .......................................................................... 48

ARTICLE VI NEGATIVE COVENANTS .............................................................. 49
Section 6.1    Incurrence of Indebtedness. .............................................................. 49
Section 6.2    Asset Sales; Events of Loss. ............................................................. 50
Section 6.3    Restricted Payments. ......................................................................... 50
Section 6.4    Dividend and Other Payment Restrictions. ....................................... 51
Section 6.5    Transactions with Affiliates. ............................................................. 51
Section 6.6    Liens. ................................................................................................. 51
Section 6.7    Line of Business. ............................................................................... 53
Section 6.8    Margin Stock. .................................................................................... 53
Section 6.9    Material Contracts. ............................................................................ 53
Section 6.10    Creation of Subsidiaries. .................................................................. 53
Section 6.11    Bankruptcy Matters. ......................................................................... 53
Section 6.12    No Other Payments. .......................................................................... 54

ARTICLE VII Term ................................................................................................... 54
Section 7.1    Termination. ...................................................................................... 54
Section 7.2    Survival of Obligations Upon Termination of Financing Arrangements. ........ 54

ARTICLE VIII EVENTS OF DEFAULT; RIGHTS AND REMEDIES .................. 55
Section 8.1    Events of Default. .............................................................................. 55
Section 8.2    Remedies. .......................................................................................... 59
Section 8.3    Waivers By Borrower. ....................................................................... 60

ARTICLE IX ASSIGNMENTS AND PARTICIPATIONS ..................................... 60
Section 9.1    Lender Assignments and Participations. ........................................... 60

ARTICLE X AGENTS; THE LENDER GROUP ..................................................... 64
Section 10.1    Appointment and Authorization of DIP Agent. ................................ 64
Section 10.2    Delegation of Duties. ........................................................................ 65
Section 10.3    Liability of Agent-Related Persons. .................................................. 65
Section 10.4    Reliance by DIP Agent. .................................................................... 66
Section 10.5    Notice of Default or Event of Default. .............................................. 66
Section 10.6    Credit Decision. ................................................................................ 67

# TABLE OF CONTENTS
## (continued)

Section 10.7    Costs and Expenses; Indemnification. .............................................. 67
Section 10.8    DIP Agent in Individual Capacity................................................... 68
Section 10.9    Successor DIP Agent. ..................................................................... 68
Section 10.10   Lender in Individual Capacity. ....................................................... 69
Section 10.11   Collateral Matters........................................................................... 69
Section 10.12   Restrictions on Actions by Lenders; Sharing of Payments............. 70
Section 10.13   Payments by DIP Agent to the Lenders. ......................................... 70
Section 10.14   Concerning the Collateral and Related Loan Documents............... 71
Section 10.15   Several Obligations; No Liability. .................................................. 71
Section 10.16   Collateral......................................................................................... 71
Section 10.17   After-Acquired Collateral. ............................................................. 71
Section 10.18   Authorization of Other Actions to be Taken by DIP Agent Under the Security
                Documents ....................................................................................... 72
Section 10.19   Successor Agent by Merger, Etc..................................................... 72
Section 10.20   Delivery of Documents, Notices, Etc. ........................................... 72
ARTICLE XI MISCELLANEOUS ............................................................................... 73
Section 11.1    Complete Agreement; Modification of Agreement. ....................... 73
Section 11.2    Amendments and Waivers. ............................................................. 73
Section 11.3    Successors and Assigns................................................................... 74
Section 11.4    Taxes and Expenses. ....................................................................... 75
Section 11.5    Fees and Expenses. ......................................................................... 75
Section 11.6    No Waiver. ...................................................................................... 77
Section 11.7    Remedies.......................................................................................... 77
Section 11.8    Severability. .................................................................................... 77
Section 11.9    Conflict of Terms. ........................................................................... 77
Section 11.10   Confidentiality. ............................................................................... 77
Section 11.11   GOVERNING LAW, CONSENT TO JURISDICTION AND SERVICE OF
                PROCESS; WAIVER OF JURY TRIAL. ...................................... 78
Section 11.12   Notices. ........................................................................................... 79
Section 11.13   Section Titles. ................................................................................. 81
Section 11.14   Counterparts; Effectiveness. .......................................................... 81
Section 11.15   USA PATRIOT Act. ....................................................................... 81
Section 11.16   Statements Required in Officer's Certificate.................................. 81
Section 11.17   Reinstatement. ................................................................................ 82
Section 11.18   Attorney-In-Fact. ........................................................................... 82
Section 11.19   Advice of Counsel........................................................................... 83
Section 11.20   No Strict Construction. ................................................................... 83

**TABLE OF CONTENTS**
**(continued)**

EXHIBITS

Exhibit A            Form of Assignment and Assumption Agreement
Exhibit B            Form of Note
Exhibit C            Form of Borrowing Request
Exhibit D            Form of Final Order


SCHEDULES

Schedule 1.1(a)      Designated Account
Schedule 1.1(c)      Operating Accounts
Schedule 1.2         Revolving Loan Commitments
Schedule 4.2         Executive Offices; Collateral Locations; FEIN; Organizational
                     Information
Schedule 4.10        Litigation
Schedule 4.11        Insurance
Schedule 5.2(a)      Initial Budget
Schedule 5.4         Properties, Licenses and Permits
Schedule 5.6         Corporate Existence
Schedule 6.1         Indebtedness
Schedule 6.6         Liens

548336.10/2576-00015

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

THIS **DEBTOR-IN-POSSESSION CREDIT AGREEMENT**, dated as of November [__], 2009, is made by and among **EXPRESS ENERGY SERVICES OPERATING, LP**, a Texas limited partnership ("**Borrower**"), **EXPRESS ENERGY SERVICES (2008) LLC**, a Texas limited liability company ("**Holdings**"), **EXPRESS ENERGY SERVICES HOLDING, LP**, a Texas limited partnership (the "**LP**"), **EXPRESS ENERGY SERVICES GP, LLC**, a Texas limited liability company (the "**GP**" and together with the LP, each a "**Parent Entity**" and together, the "**Parent Entities**") and the Subsidiaries of Borrower party hereto as Subsidiary Guarantors (the "**Subsidiary Guarantors**" and together with Borrower, Holdings, the LP and GP each a "**Debtor**" and collectively, the "**Debtors**"), each as debtors and debtors-in-possession in cases pending under Chapter 11 of Title 11 of the United States Code (the cases of Debtors, each a "**Chapter 11 Case**" and collectively, the "**Chapter 11 Cases**"), the financial institutions from time to time party hereto as lenders (collectively with their successors and assigns, the "**Lenders**", and each of them, a "**Lender**"), and **ORIX FINANCE CORP.** ("**ORIX**"), in its capacity as administrative agent for the Lenders (with its successors and assigns in such capacity, the "**DIP Agent**").

### RECITALS

WHEREAS, unless otherwise defined, capitalized terms used in these Recitals shall be as set forth in Section 1.1;

WHEREAS, on October 27, 2009 (the "**Petition Date**"), the Debtors filed voluntary petitions with the Bankruptcy Court initiating the Chapter 11 Cases and have continued in the possession of their respective assets and in the management of their respective businesses pursuant to Bankruptcy Code Sections 1107 and 1108;

WHEREAS, an immediate and on-going need exists for the Debtors to obtain additional funds in order to continue the operation of their businesses as debtors-in-possession under Chapter 11 of the Bankruptcy Code and, accordingly, the Debtors have requested that the Lenders extend post-petition financing to Borrower;

WHEREAS, the Lenders are willing to make the Revolving Loans to Borrower upon the terms and conditions set forth herein;

WHEREAS, all of Borrower's obligations under the Revolving Loans will be guaranteed by Guarantors;

WHEREAS, Borrower and Guarantors have agreed to secure all of their Obligations under this Agreement and the other Loan Documents by granting to DIP Agent, for the benefit of DIP Agent and the Lenders, a security interest in and Lien upon all of the Collateral with the order of priority set forth in Section 2.14;

WHEREAS, Borrower and Guarantors have agreed that DIP Agent, for the benefit of DIP Agent and the Lenders, shall be entitled to a Superpriority Claim, with the order of priority set forth in <u>Section 2.14</u>, to provide for the repayment of the Obligations; and

WHEREAS, all Schedules, Exhibits and other attachments hereto, or expressly identified to this Agreement, are incorporated herein by reference, and taken together, shall constitute but a single agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, the parties hereto agree as follows:

**ARTICLE I**

**DEFINITIONS**

**Section 1.1     Definitions.**

Capitalized terms used herein shall have the following respective meanings:

"**Act**" has the meaning set forth in <u>Section 11.15</u>.

"**Additional Documents**" has the meaning set forth in <u>Section 5.11</u>.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by DIP Agent.

"**Affected Lender**" has the meaning set forth in <u>Section 2.11</u>.

"**Affected Loans**" has the meaning set forth in <u>Section 2.12(b)</u>.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "**control**", as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; provided, that, beneficial ownership of 10% or more of the Voting Stock of a Person shall be deemed to be control.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"**Affiliate Transactions**" has the meaning set forth in <u>Section 6.5</u>.

"**Agent-Related Persons**" means DIP Agent, together with its respective Affiliates, Related Funds, officers, directors, employees, attorneys, and agents.

"**Agreement**" means this Debtor-in-Possession Credit Agreement dated as of the date hereof, as the same may be amended, restated, modified, supplemented or otherwise

2

modified from time to time, together with all exhibits and schedules from time to time attached hereto as well as any attachments from time to time attached thereto, in each case, as amended, restated, modified, supplemented or otherwise modified from time to time.

"**Asset Sale**" means the sale, lease, sub-lease, sale and leaseback, assignment, conveyance, transfer, issuance or other disposition (by way of merger, casualty, condemnation or otherwise) by any Debtor of (a) any Capital Stock of its Subsidiaries or (b) any other assets of any Debtor; provided that the sales of inventory, worn out or surplus property in the ordinary course of business shall not be an "**Asset Sale**" for any purpose hereunder.

"**Assignment and Assumption**" means an Assignment and Assumption Agreement substantially in the form of Exhibit A.

"**Avoidance Actions**" means claims and causes of action under §§ 502(d), 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or other applicable law.

"**Bankruptcy Code**" means the provisions of Title 11 of the United States Code (11 U.S.C. §§101 et seq.), as amended, and any successor statute.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

"**Base Rate**" means, for any day, a fluctuating interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the highest of:

(a)     the Prime Rate;

(b)     ½ of 1.00% per annum above the Federal Funds Rate;

(c)     the three-month Eurodollar Rate in effect as of the most recent to occur of (x) the date of the applicable Borrowing, (y) the first day of the month in which such day occurs, or (z) the date of the most recent change in the Prime Rate (each a "**Eurodollar Test Date**"), *plus* (for this clause (c)) 1.00%; and

(d)     the Base Rate Floor.

The Base Rate is not intended to be nor will it necessarily be the lowest rate of interest extended by ORIX to its customers. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Rate or the Eurodollar Rate shall be effective on the effective date of such change in the Prime Rate, the Federal Funds Rate or the Eurodollar Rate, as applicable.

"**Base Rate Floor**" means 4.50% per annum.

"**Base Rate Loans**" means Revolving Loans bearing interest at a rate determined by reference to the Base Rate.

"**Board of Directors**" means (i) with respect to a corporation or company, the board of directors of the corporation or company, as the case may be, or any committee thereof

duly authorized to act on behalf of such board; (ii) with respect to a partnership, the board of directors of the general partner of the partnership; (iii) with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and (iv) with respect to any other Person, the board or committee of such Person serving a similar function.

"**Borrower**" has the meaning set forth in the introductory paragraph hereto.

"**Borrowing**" means a borrowing hereunder consisting of Revolving Loans made on the same day by the Lenders (or DIP Agent on behalf thereof) to Borrower.

"**Borrowing Request**" has the meaning set forth in Section 2.1(b)(i).

"**Budgets**" has the meaning set forth in Section 5.2(b).

"**Business Day**" means (i) any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in the State of New York and on which the New York Stock Exchange is not closed and (ii) with respect to all notices, determinations, fundings and payments in connection with the Eurodollar Rate or any Eurodollar Rate Loan, the term "Business Day" shall mean any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Capital Lease Obligation**" means, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet prepared in accordance with GAAP.

"**Capital Stock**" means (i) in the case of a corporation, corporate stock; (ii) in the case of a company, common shares; (iii) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (iv) in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and (v) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"**Carve-Out**" has the meaning set forth in Section 2.14(c).

"**Cash Collateral Order**" means the Agreed Interim Order Granting Debtors' Emergency Motion For an Order Scheduling a Final Hearing Regarding the Use of Cash Collateral (together with any final order entered with respect to the use of cash collateral and amendment to such order).

"**Cash Equivalents**" means (i) Dollars; (ii) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality of the United States government (provided, that the full faith and credit of the United States is pledged

in support of those securities) having maturities of not more than six months from the date of acquisition; (iii) certificates of deposit and eurodollar time deposits with maturities of six months or less from the date of acquisition, bankers' acceptances with maturities not exceeding six months and overnight bank deposits, in each case with any domestic commercial bank having capital and surplus in excess of $500,000,000 and a Thompson Bank Watch Rating of "B" or better; (iv) repurchase obligations with a term of not more than seven days for underlying securities of the types described in <u>clauses (ii)</u> and <u>(iii)</u> above entered into with any financial institution meeting the qualifications specified in <u>clause (iii)</u> above; (v) commercial paper having one of the two highest ratings obtainable from Moody's or Standard & Poor's, in each case, maturing within six months after the date of acquisition; and (vi) money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in <u>clauses (i)</u> through <u>(v)</u> of this definition.

"**Chapter 11 Cases**" has the meaning set forth in the Preamble.

"**Charges**" means all federal, state, county, city, municipal, local, foreign or other taxes of a Governmental Authority, levies, assessments, charges, Liens, claims or encumbrances upon or relating to (a) the Collateral, (b) the Obligations, (c) the employees, payroll, income or gross receipts of any Debtor, (d) any Debtor's ownership or use of any properties or other assets, or (e) any other aspect of such Debtor's business.

"**Closing Date**" means the date upon which the conditions precedent set forth in <u>Section 3.1</u> are satisfied.

"**Code**" means the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of New York; <u>provided</u>, <u>however,</u> in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to DIP Agent's Liens on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "**Code**" means the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"**Collateral**" has the meaning set forth in <u>Section 2.14(b)</u> and in the Final Order.

"**Collections**" means all cash, checks, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds).

"**Committee**" has the meaning set forth in <u>Section 2.14(c)(ii)</u>.

"**Control Agreement**" means a control agreement, in form and substance satisfactory to DIP Agent and the Lenders, executed and delivered by Borrower and DIP Agent on behalf of the Lender Group and the applicable bank.

"**Daily Balance**" means, as of any date of determination and with respect to any Obligation, the amount of such Obligation owed at the end of such day.

*DIP Credit Agreement*

"**Debtor**" has the meaning set forth in the Preamble.

"**Debtors**" has the meaning set forth in the Preamble.

"**Default**" means any event which, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

"**Default Rate**" has the meaning set forth in Section 2.4(b).

"**Defaulting Lender**" means any Lender that fails to make any Revolving Loan (or other extension of credit) that it is required to make hereunder on the date that it is required to do so hereunder.

"**Defaulting Lender Rate**" means (a) for the first three (3) days from and after the date the relevant payment is due, the Eurodollar Rate, and (b) thereafter, the interest rate then applicable to the Revolving Loans.

"**Designated Account**" means the deposit account of Borrower identified on Schedule 1.1(a).

"**DIP Agent**" has the meaning set forth in the introductory paragraph hereto.

"**DIP Agent's Account**" means a deposit account of DIP Agent designated from time to time by DIP Agent in a notice to each Lender, Borrower or any other Person.

"**Dollars**" or "**$**" means lawful currency of the United States of America.

"**Eligible Transferee**" means (a) a commercial bank organized under the laws of the United States, or any state thereof, and having total assets in excess of $250,000,000, (b) a commercial bank organized under the laws of any other country which is a member of the Organization for Economic Cooperation and Development or a political subdivision of any such country and which has total assets in excess of $250,000,000, provided that such bank is acting through a branch or agency located in the United States, (c) a finance company, insurance company, or other financial institution or fund that is engaged in making, purchasing, or otherwise investing in commercial loans having (together with its Affiliates and Related Funds) total assets (including assets under management) in excess of $250,000,000, (d) any Lender or any Affiliate (other than individuals) of any Lender or any Related Fund of any Lender and (e) any other Person (other than a natural Person) approved by Borrower (so long as no Default or Event of Default has occurred and is continuing), such approval not to be unreasonably withheld or delayed; provided, however, that no Debtor nor any of its Affiliates shall be an Eligible Transferee.

"**Employee Benefit Plan**" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including any Multiemployer Plan).

"**Environmental Laws**" means all federal, state, local or foreign laws relating to pollution or protection of human health or the environment (including, without limitation,

*DIP Credit Agreement*

ambient air, surface water, groundwater, land surface or subsurface strata), including, without limitation, laws relating to emissions, discharges, releases or threatened releases of Hazardous Materials into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as all authorizations, codes, decrees, demands or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations issued, entered, promulgated or approved thereunder.

"**Equity Interests**" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with Borrower, is treated as a single employer under Section 414(b) or (c) of the IRC or, solely for purposes of Section 302 of ERISA and Section 412 of the IRC, is treated as a single employer under Section 414 of the IRC.

"**ERISA Event**" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the IRC or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the IRC or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"**Eurodollar Rate**" means, for any period, the offered rate per annum for deposits of U.S. dollars for the applicable period that appears on Reuters Screen LIBO Page as of 11:00 A.M. (London, England time) two (2) Business Days prior to the applicable Eurodollar Test Date. If no such offered rate exists, such rate will be the rate of interest per annum, as determined by DIP Agent (rounded upwards, if necessary, to the nearest 1/16 of 1%) at which deposits of U.S. dollars in immediately available funds are offered at 11:00 A.M. (London, England time) two (2) Business Days prior to the applicable Eurodollar Test Date by major financial institutions reasonably satisfactory to DIP Agent in the London interbank market for

*DIP Credit Agreement*

such period for the applicable principal amount on such date of determination; <u>provided</u> that in no event shall the Eurodollar Rate be less than the Eurodollar Rate Floor.

"**Eurodollar Rate Floor**" means 2.50% per annum.

"**Eurodollar Rate Loans**" means Revolving Loans bearing interest at a rate determined by reference to the Eurodollar Rate.

"**Event of Default**" has the meaning set forth in <u>Section 8.1</u>.

"**Excess**" has the meaning set forth in <u>Section 2.4(e)</u>.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Facility Maturity Date**" means the earliest to occur of the following: (a) the effective date of a Reorganization Plan, (b) the consummation of the sale of all or substantially all of the assets of the Debtors (as determined by DIP Agent and the Required Lenders in their reasonable discretion), (c) the 180th day following the Closing Date, (d) the date that the Revolving Loan Commitments have been terminated pursuant to <u>Section 8.2</u>, (e) the date that all Revolving Loans shall become due and payable in full hereunder, whether by acceleration or otherwise and (f) a "Termination Event" under the Cash Collateral Order.

"**Federal Funds Rate**" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by DIP Agent from three Federal funds brokers of recognized standing selected by it.

"**Fee Letter**" means that certain letter agreement regarding fees by and between Borrower and DIP Agent dated as of October 27, 2009.

"**Final Order**" means the order of the Bankruptcy Court entered in the Chapter 11 Cases of the Debtors after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to DIP Agent and the Lenders in their discretion, which includes, without limitation, the granting of the superpriority status and Liens referred to herein, the automatic perfection of all Liens referred to herein, the payment of all fees referred to herein, the first priority Lien referred to herein, and additional provisions allowing for the Borrowing of the full amount of Revolving Loans hereunder and prohibiting any claims against the Collateral pursuant to Section 506(c) of the Bankruptcy Code (except as provided in the Carve-Out or as agreed to by the Lenders), and as to which, (i) no stay is in effect, (ii) the time to seek a rehearing, file a notice of appeal or petition for certiorari has expired and (iii) no appeal, request for a stay, petition seeking certiorari or other review is pending.

*DIP Credit Agreement*

"**Financial Statements**" means the income statements, statements of cash flows and balance sheets of the Debtors (consolidated as applicable) delivered pursuant to Section 5.1.

"**Funding Date**" means each date of a Borrowing.

"**GAAP**" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect from time to time.

"**Governing Documents**" means, with respect to any Person, the certificate of formation, articles of incorporation, charter, by-laws, limited liability company agreement, limited partnership agreement or other organizational documents of such Person.

"**Governmental Authority**" means any nation or government, any state, municipality, province or other political subdivision thereof, any applicable tribal government and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, whether now or hereafter in existence, or any officer or official thereof.

"**Granting Lender**" has the meaning set forth in Section 9.1(h).

"**Guarantee**" means a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness or any other obligations (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take or pay or to maintain financial statement conditions or otherwise).

"**Guaranty**" means that certain Guaranty, dated as of the date hereof, by and among the Guarantors and DIP Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Guarantors**" means each of the Subsidiary Guarantors, Holdings and the Parent Entities.

"**Hazardous Material**" means all or any of the following: (a) substances, materials, compounds, wastes, products, emissions and vapors that are defined or listed in, regulated by, or otherwise classified pursuant to, any applicable laws or regulations, including any so defined, listed, regulated or classified as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," "pollutants," "contaminants," or any other formulation intended to regulate, define, list or classify substances by reason of deleterious, harmful or dangerous properties, including ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity"; (b) waste oil, oil, petroleum or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters and other wastes

9                    *DIP Credit Agreement*

associated with the exploration, development or production of crude oil, natural gas or geothermal resources; (c) any flammable substances or explosives or any radioactive materials; (d) asbestos in any form; (e) electrical or hydraulic equipment which contains any oil or dielectric fluid containing polychlorinated biphenyls; (f) radon; or (g) urea formaldehyde.

"**Hedging Obligations**" means, with respect to any specified Person, the obligations of such Person under (i) interest rate swap agreements (whether from fixed to floating or from floating to fixed), interest rate cap agreements and interest rate collar agreements; (ii) other agreements or arrangements designed to manage interest rates or interest rate risk; and (iii) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange rates or commodity prices.

"**Indebtedness**" means, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables), whether or not contingent: (i) in respect of borrowed money; (ii) evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof); (iii) in respect of banker's acceptances; (iv) representing Capital Lease Obligations; (v) representing the balance deferred and unpaid of the purchase price of any property or services due more than six (6) months after such property is acquired or such services are completed; or (vi) representing Hedging Obligations.  In addition, the term "Indebtedness" includes all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) and, to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person.

"**Indemnified Liabilities**" has the meaning set forth in <u>Section 2.8</u>.

"**Indemnified Person**" has the meaning set forth in <u>Section 2.8</u>.

"**Initial Budget**" has the meaning set forth in <u>Section 5.2(a)</u>.

"**Insolvency Proceeding**" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"**interest**" has the meaning set forth in <u>Section 2.4(e)</u>.

"**Interest Payment Date**" shall mean (a) with respect to any Base Rate Loan, the last Business Day of each March, June, September and December, and (b) with respect to any Eurodollar Rate Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Rate Loan with an Interest Period of more than three months duration, each day that would have been an Interest Payment Date had successive Interest Periods of three months duration been applicable to such Borrowing.

"**Interest Period**" shall mean with respect to any Eurodollar Rate Loan, the period commencing on the date of such Borrowing and ending on the numerically corresponding

day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is one, two or three months thereafter, as Borrower may elect; provided, however, that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"**Investments**" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

"**Investment Company Act**" means the Investment Company Act of 1940, as amended, any successor legislation thereto and all regulations promulgated thereunder.

"**IRC**" means the Internal Revenue Code of 1986, as amended, any successor legislation thereto and all regulations promulgated thereunder.

"**IRS**" means the Internal Revenue Service, or any successor thereto.

"**Lender Group**" means, collectively, DIP Agent and the Lenders.

"**Lender Group Expenses**" has the meaning set forth in Section 11.5(a).

"**Lenders**" and "**Lender**" have the meanings set forth in the introductory paragraph hereto.

"**Lien**" means any mortgage or deed of trust, pledge, hypothecation, collateral assignment, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Code or comparable law of any jurisdiction).

"**Loan Documents**" means this Agreement, the Notes, the  Guaranty, the Security Agreement, each other Security Document and all other agreements, instruments, certificates and other documents executed by or on behalf of Borrower, Guarantors or any of their respective Affiliates and delivered to, or in favor of, DIP Agent or any other Lender, and any other agreement, instrument or document entered into, by or on behalf of Borrower, Guarantors or any of their respective Affiliates in connection with this Agreement or the transactions contemplated

548336.10/2576-00015                                                                                            *DIP Credit Agreement*

hereby.  Any reference in this Agreement or in any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such other Loan Document as the same may be in effect at any and all times such reference becomes operative.

"**Material Adverse Effect**" means a material adverse effect, in each case as determined in the reasonable judgment of DIP Agent and the Required Lenders in good faith, on the (a) business, properties, assets, operations, results of operations or financial condition of Borrower and Guarantors (taken as a whole) since the Petition Date, (b) Borrower's and Guarantors' ability to pay and perform the Obligations in accordance with the terms of this Agreement and the other Loan Documents, (c) DIP Agent's Liens on the Collateral or the priority of such Liens, or (d) DIP Agent's or any Lender's rights and remedies under this Agreement or under any of the other Loan Documents.

"**Maximum Legal Rate**" has the meaning set forth in Section 2.4(e).

"**Moody's**" means Moody's Investors Services, Inc. and its successors.

"**Multiemployer Plan**" means a "multiemployer plan" as defined in Section 3(37) or Section 4001(a)(3) of ERISA.

"**Net Asset Sale Proceeds**" means the aggregate cash proceeds received by any Debtor in respect of any Asset Sale (including, without limitation, any cash received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of (i) the direct costs relating to such Asset Sale, including, without limitation, legal, accounting and investment banking fees, sales commissions, relocation expenses incurred as a result of the Asset Sale, and taxes paid or payable as a result of the Asset Sale after taking into account any available tax credits or deductions and any tax sharing arrangements; (ii) amounts required to be applied to the repayment of Indebtedness, other than the Obligations under the Loan Documents, secured by a Lien on the asset or assets that were the subject of such Asset Sale; and (iii) any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP; provided, however, that so long as no Default or Event of Default shall have occurred and be continuing, only such net cash proceeds in excess of $500,000 in the aggregate shall constitute "Net Asset Sale Proceeds".

"**Net Insurance/Condemnation Proceeds**" means an amount equal to: (a) any cash payments or proceeds received by any Debtor (i) under any casualty, business interruption or "key man" insurance policies in respect of any covered loss thereunder, or (ii) as a result of the taking of any assets of a Debtor by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (b)(i) in respect of clause (a)(i) above, amounts disbursed to any party (other than the Pre-Petition Agent, the Debtors and the Debtors' Affiliates) named as "additional insured" or "loss payee" (or any similar capacity) on any such policy, (ii) any actual and reasonable costs incurred by such Debtor in connection with the adjustment or settlement of any claims of such Debtor in respect thereof, and (iii) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (a)(ii) of

*DIP Credit Agreement*

this definition to the extent paid or payable to non-Affiliates, including income taxes payable as a result of any gain recognized in connection therewith.

"**Notes**" means one or more promissory notes payable to the Lenders evidencing Borrower's Obligations to repay the Revolving Loans made to Borrower, substantially in the form and substance of <u>Exhibit B</u> attached hereto, in each case as the same may be amended, restated, supplemented, replaced, substituted or otherwise modified from time to time.

"**Obligations**" means all loans, advances, debts, liabilities and obligations, for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable), owing by any Debtor to DIP Agent, the Lenders or any Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, in each case arising under this Agreement or any of the other Loan Documents.  This term includes all principal, interest (including all interest which accrues after the commencement of any case or proceeding by or against Borrower in bankruptcy whether or not allowed in such case or proceeding), fees, expenses, Charges, indemnities, attorneys' fees and any other sum chargeable to the Debtors under this Agreement or any of the other Loan Documents.

"**Officer**" means, with respect to any Person, the Chair of the Board, the Vice Chair of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Controller, the Secretary or any Vice-President of such Person.

"**Officer's Certificate**" means, with respect to any Person, a certificate signed on behalf of such Person by two Officers of such Person, one of whom must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the such Person, that meets the requirements of <u>Section 11.16</u> hereof.

"**Operating Accounts**" means those operating accounts of Borrower located at JPMorgan Chase Bank, N.A. and Coastal Commerce Bank and all other operating accounts of Debtors, in each case, with the account details set forth on <u>Schedule 1.1(c)</u>.

"**ORIX**" has the meaning set forth in the Preamble hereto.

"**ORIX Exit Facility**" means an exit financing provided by ORIX on terms and provisions satisfactory to ORIX in its sole discretion.

"**Other Taxes**" has the meaning set forth in <u>Section 2.9(b)</u>.

"**Participant**" has the meaning set forth in <u>Section 9.1(d)</u>.

"**PBGC**" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

*DIP Credit Agreement*

"**Permitted Business**" means the business in which the Debtors are engaged on the Closing Date.

"**Permitted Debt**" has the meaning set forth in <u>Section 6.1</u>.

"**Permitted Liens**" has the meaning set forth in <u>Section 6.6</u>.

"**Permitted Refinancing**" means, as to any Indebtedness, the incurrence of other Indebtedness to refinance, refund, renew or extend such existing Indebtedness; <u>provided</u> that in the case of such other Indebtedness, the following conditions are satisfied: (i) the amount of such Indebtedness is not increased at the time of such refinancing, refunding, renewal or extension except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (ii) the terms relating to principal amount, amortization, maturity, collateral (if any) and subordination (if any), and other material terms taken as a whole, of any such refinancing, refunding, renewing or extending Indebtedness, and of any agreement entered into and of any instrument issued in connection therewith, are no less favorable in any material respect to the Loan Parties or the Lenders than the terms of any agreement or instrument governing the Indebtedness being refinanced, refunded, renewed or extended and the interest rate applicable to any such refinancing, refunding, renewing or extending Indebtedness does not exceed the then applicable market interest rate and (iii) the original obligors in respect of such Indebtedness remain the only obligors thereon.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"**Petition Date**" has the meaning set forth in the Recitals.

"**Plan**" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the IRC or Section 302 of ERISA, and in respect of which Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Plan Support Agreement**" means the Plan Support Agreement, dated as of October 27, 2009, by and among the Debtors, the Pre-Petition Agent and the Pre-Petition Lenders party thereto.

"**Pre-Petition Agent**" means, Credit Suisse, Cayman Islands Branch, as Administrative Agent and Collateral Agent under the Pre-Petition Facility.

"**Pre-Petition Facility**" means (i) the Credit Agreement, dated as of July 11, 2008, by and among Borrower, as borrower, each of the Parent Entities and Holdings, as

*DIP Credit Agreement*

guarantors, the Pre-Petition Agent, the Pre-Petition Lenders, Credit Suisse Securities (USA) LLC and Lehman Brothers Inc., as joint bookrunners and joint lead arrangers and Lehman Brothers Inc., as syndication agent and (ii) that certain Swap Agreement, dated as of July 11, 2008.

"**Pre-Petition Lenders**" means, the lenders party to the Pre-Petition Facility.

"**Prime Rate**" means the rate of interest which is identified as the "Prime Rate" and normally published in the Money Rates section of The Wall Street Journal (or, if such rate ceases to be so published, as quoted from such other generally available and recognizable source as DIP Agent may select).

"**Professionals**" has the meaning set forth in Section 2.14(c)(i).

"***Pro Rata Share***" means, with respect to any Lender as of the date of determination, with respect to a Lender's obligation to make Revolving Loans and right to receive payments of principal, interest, fees, costs, and expenses with respect thereto or any other matter, (a) prior to the Revolving Loan Commitments being terminated or reduced to zero, the percentage obtained by dividing (i) such Lender's Revolving Loan Commitment by (ii) the aggregate Revolving Loan Commitments of all Lenders, and (b) from and after the time that the Revolving Loan Commitments have been terminated or reduced to zero, the percentage obtained by dividing (i) the aggregate outstanding principal amount of such Lender's Revolving Loans by (ii) the aggregate outstanding principal amount of all Revolving Loans.

"**Register**" has the meaning set forth in Section 9.1(c).

"**Related Fund**" means, with respect to any fund or account that invests in loans, any other fund or account that invests in loans and that is administered, advised or managed by the same investment manager or advisor as such first fund or account or by an entity that is an Affiliate of such first fund or account's investment manager or advisor.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and Related Funds and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates and Related Funds.

"**Reorganization Plan**" means a plan of reorganization or liquidation filed by the Debtors in any of the Chapter 11 Cases.

"**Required Lenders**" means (a) at any time when there are more than two (2) Lenders (excluding any Affiliates and Related Funds of a Lender), Lenders whose aggregate *Pro Rata* Share exceeds 50% and (b) at any time when there are two (2) or fewer Lenders (excluding any Affiliates and Related Funds of a Lender), all of such Lenders.

"**Responsible Officer**" means, with respect to any Person, any executive officer, the principal financial officer, the treasurer or the principal accounting officer of such Person and any other Officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

*DIP Credit Agreement*

"**Restricted Payment**" has the meaning set forth in <u>Section 6.3</u>.

"**Revolving Loan**" means a revolving loan made by a Lender pursuant to <u>Section 2.1</u> and in an aggregate principal amount not to exceed the sum of the Revolving Loan Commitments.

"**Revolving Loan Commitment**" means the commitment of each Lender to make its *Pro Rata* Share of the Revolving Loans to Borrower in an aggregate principal amount at any one time outstanding not to exceed sum of the amount set forth opposite such Lender's name on <u>Schedule 1.2</u>.  The aggregate amount of the Revolving Credit Commitments as of the Closing Date is $20,000,000.

"**Revolving Loan Commitment Period**" means the period commencing on the date of satisfaction of all of the conditions set forth in <u>Sections 3.1</u> and <u>3.2</u>, and to but excluding the Facility Maturity Date.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Security Agreement**" means that certain Security Agreement, dated as of the date hereof, by and among Borrower, Guarantors and DIP Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Security Documents**" means the Security Agreement, any Control Agreement (if requested), the Final Order, and all other agreements granting a Lien upon property as security for payment of the Obligations, in each case as the same shall be amended, restated, supplemented or otherwise modified from time to time.

"**SPC**"  has the meaning set forth in <u>Section 9.1(h)</u>.

"**Standard & Poor's**" means Standard & Poor's Corporation and its successors.

"**Subsequent Budget**" has the meaning set forth in <u>Section 5.2(b)</u>

"**Subsidiary**" means, with respect to any specified Person: (a) any corporation, company, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' or shareholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, company, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and (b) any partnership (i) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (ii) the only general partners of which are that Person or one or more Subsidiaries of that Person (or any combination thereof). Unless the context otherwise requires, each reference to a Subsidiary shall be a reference to a Subsidiary of Borrower.

"**Subsidiary Guarantor**" means each of the Subsidiaries of Borrower listed on the signature pages hereto.

"**Superpriority Claim**" means an administrative expense claim having priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code.

"**Taxes**" means taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding (i) taxes imposed on or measured by the net income of DIP Agent or any Lender (or any assignee of any Lender), (ii) franchise taxes and similar fees or charges of any such Person, in each case imposed by the jurisdictions under the laws of which such Person is organized or conducts business or any political subdivision thereof and (iii) Other Taxes.

"**Type**" shall refer to the Rate by reference to which interest on such Revolving Loan or on the Revolving Loans comprising such Borrowing is determined. For purposes hereof, the term "**Rate**" shall mean the Eurodollar Rate and the Base Rate.

"**United States**" means the United States of America.

"**USA PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001), as amended.

"**Voidable Transfer**" has the meaning set forth in Section 11.17.

"**Voting Stock**" of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"**Weekly Report**" has the meaning set forth in Section 5.1(d).

"**Withdrawal Liability**" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

**Section 1.2    Construction.**

(a)    Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein, provided, however, that to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern.

(b)     All accounting terms not otherwise defined herein, unless the context indicates otherwise, shall have the meaning given to such terms under GAAP to the same extent used or defined therein.

(c)     Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting and shall be deemed to be followed with the phrase "without limitation", and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or".  The words "hereof", "herein", "hereby", "hereunder", and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be.  Section, subsection, clause, subclause, schedule, appendix and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement or in the other Loan Documents to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein).  Any reference herein to the satisfaction or repayment in full of the Obligations shall mean the repayment in full in cash (or cash collateralization in accordance with the terms hereof) of all Obligations.  Any reference herein to any Person shall be construed to include such Person's successors and assigns, or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons; and all references to statutes and related regulations shall include any amendments of the same and any successor statutes and regulations.

(d)     All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

## ARTICLE II

## LOAN AND TERMS OF PAYMENT

**Section 2.1     Revolving Loans.**

(a)     _Revolving Loans_.   During the Revolving Loan Commitment Period, subject to and upon the terms and conditions hereof and relying on the representations and warranties set forth herein, each Lender, severally, and not jointly and severally, agrees to make Revolving Loans to Borrower in the aggregate amount up to but not exceeding such Lender's Revolving Loan Commitment.  No Lender shall have an obligation to make a Revolving Loan in excess of such Lender's _Pro Rata_ Share of the Revolving Loan Commitments.  Amounts borrowed pursuant to this Section 2.1 may be repaid and re-borrowed during the Revolving Loan Commitment Period.  Each Lender's Revolving Loan Commitment shall terminate immediately and without further action on the Facility Maturity Date, and all Revolving Loans and all other amounts owed hereunder with respect to the Revolving Credit Loans and the Revolving Credit Commitments shall be paid in full no later than such date.

      (b)      <u>Procedure for Borrowing</u>.

      (i)      When Borrower desires to request a Borrowing under <u>Section 2.1(a)</u>, Borrower shall deliver to DIP Agent a written notice substantially in the form attached hereto as <u>Exhibit C</u> (each such notice, a "**Borrowing Request**") signed by a Responsible Officer of Borrower, requesting such Borrowing:

      (x) in the case of same-day Borrowings, no later than 9:00 a.m. (New York time) on the date of the proposed Funding Date (and any Borrowing Request received after 9:00 a.m. shall be deemed to have been received the following Business Day); <u>provided</u>, that (A) all such same-day Borrowings shall be Base Rate Loans and (B) the aggregate amount of all same-day Borrowings shall not exceed $1,000,000 on any day; and

      (y) in the case of all other Borrowings, no later than 12:00 p.m. (New York time) (and any Borrowing Request received after 12:00 p.m. shall be deemed to have been received the following Business Day):

      (A) at least one (1) Business Day in advance of the proposed Funding Date for such Borrowing, or such later time or date as DIP Agent may otherwise agree, in the case of Base Rate Loans in amounts up to $5,000,000; and

      (B) at least three (3) Business Days in advance of the proposed Funding Date for such Borrowing  or such later time or date as DIP Agent may otherwise agree, in the case of (A) Eurodollar Rate Loans; and (B) Base Rate Loans that are in excess of $5,000,000.

Any such Borrowing Request delivered to DIP Agent shall be irrevocable.

      (ii)      Except as set forth above, Revolving Loans shall be made in an aggregate minimum amount of $100,000 and integral multiples of $50,000 in excess of that amount or in such lesser amount as shall constitute the entire Revolving Loan Commitment then available or as DIP Agent and Lenders may otherwise agree.

      (c)      <u>Making of Revolving Loans</u>.

      (i)      DIP Agent shall promptly notify the Lenders on the Business Day immediately preceding each applicable Funding Date (or by 10:00 a.m. on the date of the applicable Funding Date, in the case of same-day Borrowings), by telecopy, telephone, electronic mail or other similar form of transmission, of the requested Borrowing.  Each Lender shall make the amount of such Lender's *Pro Rata* Share of the requested Borrowing available to DIP Agent in immediately available funds, to DIP Agent's Account, (i) on the date of the applicable Funding Date (with no time deadline) in the case of same-day Borrowings and (ii) not later than 2:00 p.m. (New York time) on the Funding Date applicable thereto in the case of all other Borrowings.  After DIP Agent's receipt of the proceeds of such Revolving Loans, DIP Agent shall make the proceeds thereof available to Borrower on the applicable Funding Date by transferring immediately available funds equal to such proceeds received by DIP Agent to

Borrower's Designated Account (for the avoidance of doubt, DIP Agent shall not be required to advance funds to the extent not received from the Lenders).

(ii)       Unless DIP Agent receives notice from a Lender prior to 9:00 a.m. (New York time) on the date of a Borrowing (or prior to 1:00 p.m. (New York time), in the case of same-day Borrowings) that such Lender will not make available as and when required hereunder to DIP Agent for the account of Borrower the amount of that Lender's *Pro Rata* Share of such Borrowing, DIP Agent may assume that each Lender has made or will make such amount available to DIP Agent in immediately available funds on the Funding Date and DIP Agent may (but shall not be so required), in reliance upon such assumption, make available to Borrower on such date a corresponding amount. If and to the extent any Lender shall not have made the full amount of its *Pro Rata* Share of any requested Borrowing available to DIP Agent in immediately available funds, and DIP Agent in such circumstances has made available to Borrower such amount, that Lender shall on the Business Day following such Funding Date make such amount available to DIP Agent, together with interest at the Defaulting Lender Rate for each day during such period. A notice submitted by DIP Agent to any Lender with respect to amounts owing under this subsection shall be conclusive, absent manifest error. If such amount is so made available, such payment to DIP Agent shall constitute such Lender's Revolving Loan on the date of Borrowing for all purposes of this Agreement. If such amount is not made available to DIP Agent on the Business Day following the Funding Date, DIP Agent will notify Borrower of such failure to fund and, upon demand by DIP Agent, Borrower shall pay such amount to DIP Agent for DIP Agent's account, together with interest thereon for each day elapsed since the date of such Borrowing, at a rate per annum equal to the interest rate applicable at the time to the Revolving Loan composing such Borrowing. The failure of any Lender to make any Revolving Loan on any Funding Date shall not relieve any other Lender of any obligation hereunder to make a Revolving Loan on such Funding Date, but no Lender shall be responsible for the failure of any other Lender to make the Revolving Loan to be made by such other Lender on any Funding Date.

(iii)       DIP Agent shall not be obligated to transfer to a Defaulting Lender any payments made by Borrower to DIP Agent for the Defaulting Lender's benefit, and, in the absence of such transfer to the Defaulting Lender, DIP Agent shall transfer any such payments to each other non-Defaulting Lender member of the Lender Group ratably in accordance with their Revolving Loan Commitments (but only to the extent that such Defaulting Lender's Revolving Loan was funded by the other members of the Lender Group) or, if so directed by Borrower and if no Default or Event of Default has occurred and is continuing (and to the extent such Defaulting Lender's Revolving Loan was not funded by the other members of the Lender Group), retain the same to be re-advanced to Borrower as if such Defaulting Lender had made a Revolving Loan to Borrower. Solely for the purposes of voting or consenting to matters with respect to the Loan Documents, such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Revolving Loan Commitment shall be deemed to be zero. This Section shall remain effective with respect to such Lender until (x) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable, (y) the non-Defaulting Lenders, DIP Agent, and Borrower shall have waived such Defaulting Lender's default in writing, or (z) the Defaulting Lender makes its *Pro Rata* Share of the applicable Revolving Loan and pays to DIP Agent all amounts owing by Defaulting Lender in respect thereof. The

*DIP Credit Agreement*

operation of this Section shall not be construed to increase or otherwise affect the Revolving Loan Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by Borrower of its duties and obligations hereunder to DIP Agent or to the Lenders other than such Defaulting Lender.  Any such failure to fund by any Defaulting Lender shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle Borrower at its option, upon written notice to DIP Agent, to arrange for a substitute Lender to assume the Revolving Loan Commitment of such Defaulting Lender, such substitute Lender to be acceptable to DIP Agent.  In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of an Assignment and Assumption in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever; provided,  however, that any such assumption of the Revolving Loan Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the rights or remedies of the Lender Group or Borrower against any such Defaulting Lender arising out of or in relation to such failure to fund.

(d)     Reliance by Agents and the Lenders.  DIP Agent and the Lenders shall be entitled to rely upon, and shall be fully protected in relying upon, any notices or other information provided by or on behalf of Borrower in connection with a Borrowing Request and believed by them to be genuine.  DIP Agent and the Lenders may assume that each Person executing and delivering any document or notice in accordance herewith was duly authorized.

(e)     Notation.  DIP Agent shall record on its books the principal amount of the Revolving Loans owing to each Lender, and the interests therein of each Lender, from time to time and such records shall, absent manifest error, conclusively be presumed to be correct and accurate.

(f)     Conversion/Continuation of Borrowings.  Borrower shall have the right at any time upon prior irrevocable notice to DIP Agent (a) not later than 12:00 p.m. (New York time), one (1) Business Day prior to conversion, to convert all or a portion of a Eurodollar Rate Loan into Base Rate Loan, (b) not later than 12:00 p.m. (New York time), three (3) Business Days prior to conversion or continuation, to convert all or a portion of any Base Rate Loan into a Eurodollar Rate Loan or to continue all or a portion of any Eurodollar Rate Loan as a Eurodollar Rate Loan for an additional Interest Period, and (c) not later than 12:00 p.m. (New York), three (3) Business Days prior to conversion, to convert the Interest Period with respect to all or a portion of any Eurodollar Rate Loan to another permissible Interest Period, subject, in each case, to the following:

(i)     each conversion or continuation shall be made pro rata among the Lenders in accordance with the respective principal amounts of the Revolving Loans comprising the converted or continued Borrowing;

(ii)     if less than all of the outstanding principal amount of any Borrowing shall be converted or continued, then each resulting Borrowing shall satisfy the limitations

*DIP Credit Agreement*

specified in <u>Sections 2.01(b)(ii)</u> regarding the principal amount and maximum number of Borrowings of the relevant Type;

       (iii)    each conversion shall be effected by each Lender and DIP Agent by recording for the account of such Lender the new Revolving Loan of such Lender resulting from such conversion and reducing the Revolving Loan (or portion thereof) of such Lender being converted by an equivalent principal amount; accrued interest on any Eurodollar Rate Loan (or portion thereof) being converted shall be paid by Borrower at the time of conversion;

       (iv)    any portion of a Borrowing maturing or required to be repaid in less than one month may not be converted into or continued as a Eurodollar Rate Loan;

       (v)    any portion of a Eurodollar Rate Loan that cannot be converted into or continued as a Eurodollar Rate Loan by reason of the immediately preceding clause shall be automatically converted at the end of the Interest Period in effect for such Borrowing into a Base Rate Loan; and

       (vi)    upon notice to Borrower from DIP Agent given at the request of the Required Lenders or DIP Agent in their or its sole discretion, after the occurrence and during the continuance of a Default or Event of Default, no outstanding Revolving Loan may be converted into, or continued as, a Eurodollar Rate Loan.

Each notice pursuant to this <u>Section 2.1(f)</u> shall be irrevocable and shall refer to this Agreement and specify (i) the identity and amount of the Borrowing that Borrower requests be converted or continued, (ii) whether such Borrowing is to be converted to or continued as a Eurodollar Rate Loan or a Base Rate Loan, (iii) if such notice requests a conversion, the date of such conversion (which shall be a Business Day) and (iv) if such Borrowing is to be converted to or continued as a Eurodollar Rate Loan, the Interest Period with respect thereto. If no Interest Period is specified in any such notice with respect to any conversion to or continuation as a Eurodollar Rate Loan, Borrower shall be deemed to have selected an Interest Period of one month's duration. DIP Agent shall promptly advise the Lenders of any notice given pursuant to this <u>Section 2.1(f)</u> and of each Lender's portion of any converted or continued Borrowing. If Borrower shall not have given notice in accordance with this <u>Section 2.1(f)</u> to continue any Borrowing into a subsequent Interest Period (and shall not otherwise have given notice in accordance with this <u>Section 2.1(f)</u> to convert such Borrowing), such Borrowing shall, at the end of the Interest Period applicable thereto (unless repaid pursuant to the terms hereof), automatically be continued as a Base Rate Loan.

**Section 2.2    Maturity.**

       The aggregate outstanding principal balance of all Revolving Loans made hereunder, together with all other Obligations, shall be due and payable in full, together with all interest thereon as described in <u>Section 2.4</u> and all other sums due hereunder, in immediately available funds, on the Facility Maturity Date, via electronic funds transfer to DIP Agent's Account for the account of the Lender Group.

       *DIP Credit Agreement*

**Section 2.3    Prepayments.**

(a)    <u>Voluntary Partial Prepayments</u>.    At any time and from time to time Borrower may prepay the Revolving Loans and/or the Revolving Loan Commitments may be reduced, on any Business Day in whole or in part.  The Revolving Loans shall be prepaid according to each Lender's *Pro Rata* Share.

(b)    <u>Mandatory Prepayments</u>.

(i)    <u>Asset Sales/Insurance</u>.    No later than the first Business Day following the date of receipt by any Debtor of any Net Asset Sale Proceeds or any Net Insurance/Condemnation Proceeds, Borrower shall prepay the Revolving Loans and the Revolving Loan Commitments shall be permanently reduced to the extent thereof; <u>provided</u> that (i) so long as no Default or Event of Default shall have occurred and be continuing, and (ii) to the extent that (a) with respect to Net Asset Sale Proceeds, the aggregate Net Asset Sale Proceeds do not exceed $1,500,000 from the Closing Date through the date of determination or (b) with respect to Net Insurance/Condemnation Proceeds, the aggregate Net Insurance/Condemnation Proceeds do not exceed $2,000,000 from the Closing Date through the date of determination, Borrower shall have the option, directly or through one or more of its Subsidiaries, to invest any such proceeds within one hundred eighty (180) days of receipt thereof in productive assets of the general type used in the business of Borrower and its Subsidiaries.

(ii)    <u>Issuance of Debt</u>.    On the date of receipt by any Debtor of any proceeds from the incurrence of any Indebtedness of Holdings or any of its Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 7.1), Company shall prepay the Revolving Loans and/or the Revolving Commitments shall be permanently reduced as to the extent of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, in each case, paid to non-Affiliates, including reasonable legal fees and expenses.

(iii)    <u>Availability</u>.    Borrower shall immediately prepay the Revolving Loans at any time that the Revolving Loans outstanding exceed the Revolving Loan Commitments then in effect.

(c)    <u>Application of Mandatory Prepayments</u>.    So long as no Default or Event of Default shall have occurred and is continuing, all mandatory prepayments required pursuant to <u>Section 2.3(b)(i)</u> and <u>Section 2.3(b)(ii)</u>, shall be applied in the following order:

(i)    <u>first</u>, to pay all accrued and unpaid interest as of the date of the repayment until such interest has been paid in full;

(ii)    <u>second</u>, to pay the outstanding principal of all Revolving Loans until paid in full, with a permanent reduction of Revolving Loan Commitments by an equivalent amount; and

(iii) <u>third</u>, to pay all other Obligations due to DIP Agent or the Lenders until paid in full, with a permanent reduction of Revolving Loan Commitments by an equivalent amount.

The Revolving Loan Commitments shall be further permanently reduced by an amount equal to the balance of proceeds remaining after application of the proceeds pursuant to clauses (i) through (iii) above.

**Section 2.4    Interest.**

(a) <u>Interest Rate</u>.  Except as otherwise set forth in <u>Section 2.4(b)</u> herein, the Revolving Loans outstanding shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) at a rate per annum equal to (i) in the case of Base Rate Loans, at the Base Rate <u>plus</u> 6.50% per annum and (ii) in the case of Eurodollar Rate Loans, at the Eurodollar Rate <u>plus</u> 7.50%.

(b) <u>Default Rate</u>.  Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to two percentage points (2.00%) above the rate of interest otherwise applicable hereunder (the "**Default Rate**").

(c) <u>Payment of Interest</u>.  Interest on each Revolving Loan shall be payable on the Interest Payment Dates applicable to such Revolving Loan except as otherwise provided in this Agreement.  The applicable Base Rate or Eurodollar Rate for each Interest Period or day within an Interest Period, as the case may be, shall be determined by DIP Agent, and such determination shall be conclusive absent manifest error.

(d) <u>Computation</u>.  All computations of interest shall be made by DIP Agent, or its designee, on the basis of a three hundred sixty (360) day year, in each case for the actual number of days elapsed in the period for which such interest is payable.

(e) <u>Maximum Legal Rate</u>.  No agreements, conditions, provisions or stipulations contained in this Agreement or any other instrument, document or agreement between the Debtors and DIP Agent or any Lender or default of the Debtors, or the exercise by DIP Agent or any Lender of the right to accelerate the payment of the maturity of principal and interest, or to exercise any option whatsoever contained in this Agreement or any other Loan Document, or the arising of any contingency whatsoever, shall entitle any Lender to contract for, charge, or receive, in any event, consideration for the use, forbearance or detention of money ("**interest**") at a rate exceeding the maximum rate of interest permitted by applicable state or federal law in effect from time to time (hereinafter "**Maximum Legal Rate**").  In no event shall Borrower be obligated to pay interest at any rate exceeding such Maximum Legal Rate and all agreements, conditions or stipulations, if any, which may in any event or contingency whatsoever operate to bind, obligate or compel Borrower to pay a rate of interest exceeding the Maximum Legal Rate, shall be without binding force or effect, at law or in equity, to the extent only of the excess of interest determined at a rate over such Maximum Legal Rate.  In the event any interest is contracted for, charged or received at any rate in excess of the Maximum Legal

*DIP Credit Agreement*

Rate ("**Excess**"), Borrower acknowledges and stipulates that any such contract, charge, or receipt shall be the result of an accident and bona fide error, and that any Excess received by any Lender shall be applied, first, to reduce the principal then unpaid hereunder; second, to reduce the other Obligations; and third, returned to Borrower, it being the intention of the parties hereto not to enter at any time into a usurious or otherwise illegal relationship.  Borrower recognizes that, with fluctuations in the Eurodollar Rate, the Base Rate and the Maximum Legal Rate, such a result could inadvertently occur.  By the execution of this Agreement, Borrower covenants that (i) the credit or return of any Excess shall constitute the acceptance by Borrower of such Excess, and (ii) Borrower shall not seek or pursue any other remedy, legal or equitable, against DIP Agent or any Lender, based in whole or in part upon the contracting for, charging or receiving of any interest in excess of the maximum authorized or the receiving of any interest in excess of the maximum authorized by applicable law.  To the extent applicable, for the purpose of determining whether or not any Excess has been contracted for, charged or received by DIP Agent or any Lender, all interest at any time contracted for, charged or received by DIP Agent and any Lender in connection with this Agreement shall be amortized, prorated, allocated and spread in equal parts during the full stated term of this Agreement and otherwise as provided in Tex. Fin Code section 306.004 (or the successor(s) thereof).  If, as a result of any circumstances whatsoever, fulfillment of any provision hereof or of any related agreement, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by applicable usury law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity.

**Section 2.5     Fees.**

(a)     (i)     Borrower agrees to pay to the Lenders (other than any Defaulting Lender) commitment fees equal to (A) the average of the daily difference between (x) the Revolving Loan Commitments, and (y) the aggregate principal amount of outstanding Revolving Loans <u>times</u> (B) 2.00% per annum.

(ii)     Borrower agrees to pay to the Lenders an exit fee in an amount equal to 1.00% of the total Revolving Loan Commitments as of the Closing Date, which fee shall be earned as of the Closing Date and payable (together with all accrued interest thereon) on the earlier of (A) the Facility Maturity Date, (B) the emergence out of the Bankruptcy Court by the Debtors and (C) the date on which the Company merges with a third party.

(b)     All fees referred to in <u>Section 2.5(a)</u> shall be paid to DIP Agent and upon receipt, DIP Agent shall promptly distribute to each Lender its *Pro Rata* Share thereof.

(c)     All fees referred to in <u>Section 2.5(a)</u> shall be calculated on the basis of a 360-day year and the actual number of days elapsed and shall be payable monthly in arrears on the last day of each month during the Revolving Loan Commitment Period, commencing on the first such date to occur after the Closing Date, and on the Facility Maturity Date.

(d)     To the extent not otherwise set forth herein, Borrower shall pay to DIP Agent the fees set forth in the Fee Letter, as and when due and payable under the terms thereof.

*DIP Credit Agreement*

**Section 2.6     Receipt of Payments.**

(a)     The receipt of any payment item by DIP Agent shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds in Dollars made to DIP Agent's Account for itself or for the account of the Lender Group as specified herein or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrower (or any other Person making such payment) shall be deemed not to have made such payment and interest shall be calculated accordingly. Except as otherwise expressly provided herein, Borrower shall make each payment or prepayment under this Agreement by wire transfer to DIP Agent's Account not later than 11:00 a.m. (New York time) on the day when due, in immediately available funds, in Dollars. For purposes of computing interest and fees as of any date, all payments received in DIP Agent's Account in immediately available funds prior to 11:00 a.m. (New York time) on a Business Day shall be deemed to have been received on such Business Day. Payments received after 11:00 a.m. (New York time) on a Business Day and payments received at any time on a day that is not a Business Day shall, in each case, be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(b)     Unless DIP Agent receives notice from Borrower prior to the date on which any payment is due to the Lenders that Borrower will not make such payment in full as and when required, DIP Agent may assume that Borrower has made (or will make) such payment in full to DIP Agent on such date in immediately available funds and DIP Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender. If and to the extent Borrower does not make such payment in full to DIP Agent on the date when due, each Lender severally shall repay to DIP Agent on demand such amount distributed to such Lender, together with interest thereon at the Defaulting Lender Rate for each day from the date such amount is distributed to such Lender until the date repaid.

(c)     DIP Agent shall pay to each Lender, by wire transfer to such Lender's account (as specified in writing by such Lender to the DIP Agent) such Lender's *Pro Rata* Share of principal, interest and fees, in each case, received by DIP Agent, promptly after DIP Agent's receipt thereof.

**Section 2.7     Application and Allocation of Payments.**

(a)     Subject to the Final Order, all payments by Borrower or for Borrower's account, and all proceeds received by DIP Agent following an Event of Default (including without limitation any proceeds received pursuant to Section 2.3(b)), shall be applied in the following order (in each case subject to the Carve-Out):

(i)     first, to pay (i) any Lender Group Expenses then due to DIP Agent under the Loan Documents and (ii) any fees then due to DIP Agent (for its separate account, after giving effect to any agreements between DIP Agent and individual Lenders) under the Loan Documents until paid in full;

*DIP Credit Agreement*

(ii) <u>second</u>, to pay (i) any Lender Group Expenses then due to the Lenders under the Loan Documents and (ii) any fees then due to any of the Lenders under the Loan Documents, in each case, until paid in full;

(iii) <u>third</u>, to pay all accrued and unpaid interest (other than at the Default Rate) as of the date of the repayment until such interest has been paid in full;

(iv) <u>fourth</u>, to pay accrued interest at the Default Rate until paid in full;

(v) <u>fifth</u>, to pay the outstanding principal of all Revolving Loans until paid in full and to permanently, with a permanent reduction of Revolving Loan Commitments by an equivalent amount;

(vi) <u>sixth</u>, to pay all other Obligations due to DIP Agent or the Lenders until paid in full; and

(vii) <u>seventh</u>, to whomever may be lawfully entitled.

(b) For purposes of the foregoing in this <u>Section 2.7</u>, "paid in full" means payment of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest, default interest, interest on interest, and expense reimbursements provided for herein, whether or not any of the foregoing would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(c) DIP Agent is authorized to, and at its sole election may, on behalf of Borrower, charge to the balance of the Revolving Loans and cause to be paid all fees, Lender Group Expenses, Charges, costs and interest and principal owing by Borrower under this Agreement or any of the other Loan Documents if and to the extent Borrower fails to pay promptly any such amounts as and when due. Any charges so made shall constitute part of the Revolving Loans hereunder and shall bear interest applicable to Revolving Loans pursuant to the terms of this Agreement.

## Section 2.8    Indemnity.

The Debtors shall indemnify, defend and hold harmless DIP Agent, each Lender and each Participant, and each of their respective Affiliates, officers, directors, employees, advisors, attorneys, agents and representatives (each, an "**Indemnified Person**"), from and against any and all claims, demands, suits, actions, investigations, proceedings, and damages, and all reasonable attorneys fees and disbursements and other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them **AND INCLUDING WITHOUT LIMITATION WITH RESPECT TO ANY ACTION OR INACTION ARISING FROM ANY INDEMNIFIED PERSON'S NEGLIGENCE (OTHER THAN GROSS NEGLIGENCE) OR STRICT LIABILITY**, (a) in connection with or as a result of or related to the execution, delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan

*DIP Credit Agreement*

Documents, or the transactions contemplated hereby or thereby or the monitoring of Borrower's and the other Debtors' compliance with the terms of the Loan Documents, and (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto (all the foregoing, collectively, the "**Indemnified Liabilities**"). The foregoing to the contrary notwithstanding, the Debtors shall have no obligation to any Indemnified Person under this Section with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Person. This provision shall survive the termination of this Agreement and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which the Debtors was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by the Debtors with respect thereto. WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION (OTHER THAN ANY GROSSLY NEGLIGENT ACT OR GROSSLY NEGLIGENT OMISSION) OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON. NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY LOAN DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

**Section 2.9    Taxes.**

(a)    Any and all payments by Debtors hereunder or under any of the other Loan Documents shall be made, in accordance with this Section 2.9, free and clear of and without deduction for any and all present or future Taxes. If a Debtor shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any Loan Document, (i) the sum payable shall be increased as much as shall be necessary so that, after making all required deductions (including deductions applicable to additional sums payable under this Section 2.9), DIP Agent or the Lenders, as applicable, receive an amount equal to the sum they would have received had no such deductions been made, (ii) such Debtor shall make such deductions, and (iii) such Debtor shall pay the full amount deducted to the relevant taxing or other authority in accordance with applicable law. As soon as possible, but in any event within thirty (30) days, after the date of any payment of Taxes, Borrower shall furnish to DIP Agent the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment reasonably satisfactory to DIP Agent. DIP Agent and the Lenders shall not be obligated to return or refund any amounts received pursuant to this Section 2.9 unless such amounts were received in error or in overpayment, and then only to the extent of such error or overpayment.

(b)       In addition, each Debtor agrees to pay to the relevant Governmental Authority in accordance with applicable law any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Loan Document ("**Other Taxes**").  As soon as possible, but in any event within thirty (30) days after the date of any payment of Other Taxes, Borrower shall furnish to DIP Agent the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment reasonably satisfactory to DIP Agent.

(c)       Each Debtor shall jointly and severally indemnify (for the avoidance of doubt, which indemnification shall survive indefinitely) and, within ten (10) days of demand therefor, pay DIP Agent, for the benefit of the Lender Group, for the full amount of Other Taxes and Taxes (including any Other Taxes and Taxes imposed by any jurisdiction on amounts payable under this Section 2.9) arising in connection with the transactions contemplated by the Loan Documents and paid by an Agent or a Lender, as appropriate, and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Other Taxes and Taxes were correctly or legally asserted.  Each of DIP Agent and the Lenders agrees that if, in such DIP Agent's or Lender's sole discretion, it determines that it has received a refund of Other Taxes or Taxes with respect to any amount of Other Taxes and Taxes previously paid by it and as to which it has been indemnified by or on behalf of the Debtors, DIP Agent or such Lender, as the case may be, shall reimburse such Debtor to the extent of the amount of any such refund (but only to the extent of indemnity payments made, or additional amounts paid, by or on behalf of such Debtor under this Section 2.9 with respect to the Other Taxes and Taxes giving rise to such refund); provided, however, that such Debtor, upon the request of DIP Agent or such Lender, agrees to immediately repay to DIP Agent or such Lender, as the case may be, the amount paid over to such Debtor (together with any penalties, interest or other charges), in the event DIP Agent or such Lender is required to repay such amount to the relevant Governmental Authority.

(d)       If a Lender claims an exemption from United States withholding tax, such Lender agrees with and in favor of DIP Agent and Borrower, to deliver to DIP Agent (or in the case of a Lender party to an Assignment and Assumption not recorded in the Register, the assigning Lender only):

(i)       if such Lender claims an exemption from United States withholding tax pursuant to its portfolio interest exception, such Lender shall deliver (A) a verified statement of the Lender that it is not (I) a "bank" as described in Section 881(c)(3)(A) of the IRC, (II) a 10% shareholder of Borrower (within the meaning of Section 871(h)(3)(B) of the IRC), or (III) a controlled foreign corporation related to Borrower within the meaning of Section 864(d)(4) of the IRC, and (B) a properly completed and executed IRS Form W-8BEN, or IRS Form W-8IMY, as applicable, before receiving its first payment under this Agreement and at any other time reasonably requested by DIP Agent or the assigning Lender, as applicable;

(ii)       if such Lender claims an exemption from, or a reduction of, withholding tax under a United States tax treaty, properly completed and executed IRS Form W-8BEN, or IRS Form W-8IMY, as applicable, before receiving its first payment under this

*DIP Credit Agreement*

Agreement and at any other time reasonably requested by DIP Agent or the assigning Lender, as applicable;

(iii)    if such Lender claims that interest paid under this Agreement is exempt from United States withholding tax because it is effectively connected with a United States trade or business of such Lender, two properly completed and executed copies of IRS Form W-8ECI before receiving its first payment under this Agreement and at any other time reasonably requested by DIP Agent or the assigning Lender, as applicable; or

(iv)    such other form or forms, including IRS Form W-9, as may be required under the IRC or other laws of the United States as a condition to exemption from, or reduction of, United States withholding or backup withholding tax before receiving its first payment under this Agreement and at any other time reasonably requested by DIP Agent or the assigning Lender, as applicable.

Such Lender agrees promptly to notify DIP Agent, Borrower or the assigning Lender, as applicable, of any change in circumstances which would modify or render invalid any claimed exemption or reduction.  Notwithstanding anything herein to the contrary, no Lender shall be required to deliver any form it is not legally entitled to deliver.

(e)    Except to the extent such transfer is not recorded in the Register, if any Lender claims exemption from, or reduction of, withholding tax and such Lender sells or assigns all or part of the Obligations of Borrower to such Lender, such Lender agrees to notify DIP Agent of the percentage amount in which it is no longer the beneficial owner of Obligations of Borrower to such Lender.  To the extent of such percentage amount, DIP Agent and Borrower will treat such Lender's documentation provided pursuant to Sections 2.9(c) or 2.9(d) as no longer valid.  With respect to such percentage amount, Lender may provide new documentation, pursuant to Sections 2.9(c) or 2.9(d), if applicable.

(f)    If any Lender is entitled to a reduction in the applicable withholding tax, DIP Agent may withhold from any interest payment to such Lender an amount equivalent to the applicable withholding tax after taking into account such reduction.  If the forms or other documentation required by subsection (c) or (d) of this Section 2.9 are not delivered to DIP Agent, except as a result of a change in law (including any interpretations thereto) occurring after the Closing Date hereof, then DIP Agent may withhold from any interest payment to such Lender not providing such forms or other documentation an amount equivalent to the applicable withholding tax.

(g)    If the IRS or any other Governmental Authority of the United States or other jurisdiction asserts a claim that DIP Agent did not properly withhold tax from amounts paid to or for the account of any Lender due to a failure on the part of the Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify DIP Agent of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective) such Lender shall indemnify and hold DIP Agent harmless for all amounts paid, directly or indirectly, by DIP Agent, as tax or otherwise, including penalties and interest, and including any taxes imposed by any jurisdiction on the amounts payable to DIP

*DIP Credit Agreement*

Agent under this <u>Section 2.9</u>, together with all costs and expenses (including attorneys fees and expenses).  The obligation of the Lenders under this subsection shall survive the payment of all Obligations and the resignation or replacement of DIP Agent.

**Section 2.10   Increased Costs; Illegality; Capital Adequacy.**

(a)      If, due to either (i) the introduction of or any change in any law or regulation (or any change in the interpretation thereof), or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in each case adopted after the Closing Date and relating generally to the making of loans of the type contemplated by this Agreement, there shall be any increase in the cost to DIP Agent or to a Lender of agreeing to make or making, funding or maintaining the Revolving Loans, then Borrower shall, upon demand by DIP Agent, on its behalf or on behalf of such Lender, as the case may be, pay to DIP Agent, for its account or for such Lender's account, as the case may be, additional amounts sufficient to compensate DIP Agent or such Lender for such increased cost.  A statement as to the amount of such increased cost setting forth in reasonable detail DIP Agent's or such Lender's calculation thereof and the assumptions upon which such calculation was based, submitted to Borrower by DIP Agent or such Lender, shall be presumptive evidence of such costs, absent manifest error.  In determining such amount, DIP Agent or such Lender may use any reasonable averaging and attribution methods.

(b)      If, after the date hereof, any Lender determines that (i) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies or other entities, or any change in the interpretation or application thereof by any Governmental Authority charged with the administration thereof, or (ii) compliance by such Lender or its parent bank holding company with any guideline, request or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on such Lender's or such holding company's capital as a consequence of such Lender's Revolving Loan Commitments hereunder to a level below that which such Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration such Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount deemed by such Lender to be material, then such Lender may notify Borrower and DIP Agent thereof.  Following receipt of such notice, Borrower agrees to pay such Lender on demand the amount of such reduction of return of capital as and when such reduction is determined by Lender.  A statement of the amount of such Lender's reduction of return of capital setting forth in reasonable detail such Lender's calculation thereof and the assumptions upon which such calculation was based, submitted to Borrower and DIP Agent by such Lender, shall be presumptive evidence of such costs, absent manifest error.  In determining such amount, such Lender may use any reasonable averaging and attribution methods.

**Section 2.11   Mitigation.**

Each Lender agrees that, as promptly as practicable after it becomes aware of any circumstances which would result in any (i) Taxes referred to in <u>Section 2.09</u> above or (ii) increased costs referred to in <u>Section 2.10</u> above, such Lender (in each case, the "**Affected**

31

*DIP Credit Agreement*

**Lender**") shall, to the extent not inconsistent with such Lender's internal policies of general application or legal or regulatory restrictions, use commercially reasonable efforts available to it (and not, in such Lender's reasonable judgment, otherwise materially disadvantageous to such Lender) to minimize costs and expenses incurred by it and payable to it by Borrower pursuant to Section 2.9 or Section 2.10, as applicable.  Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Affected Lender in connection with any such minimalization.

**Section 2.12    Making or Maintaining Eurodollar Rate Loans.**

(a)    Inability to Determine Applicable Interest Rate.  In the event that DIP Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto) that by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to Eurodollar Rate Loans, DIP Agent shall on such date give notice (by telefacsimile or by telephone confirmed in writing) to Borrower and each Lender of such determination, whereupon (i) no Revolving Loans may be made as, or converted to, Eurodollar Rate Loans until such time as DIP Agent notifies Borrower and Lenders that the circumstances giving rise to such notice no longer exist, and (ii) any Borrowing Notice or conversion/continuation notice given by Borrower with respect to the Revolving Loans in respect of which such determination was made shall be deemed to be rescinded by Borrower.

(b)    Illegality or Impracticability of Eurodollar Rate Loans.  In the event that on any date any Lender shall have determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with Borrower and DIP Agent) that the making, maintaining or continuation of its Eurodollar Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) has become impracticable, as a result of contingencies occurring after the date hereof which materially and adversely affect the London interbank market or the position of such Lender in that market, then, and in any such event, such Lender shall be an "**Affected Lender**" and it shall on that day give notice (by telefacsimile or by telephone confirmed in writing) to Borrower and DIP Agent of such determination (which notice DIP Agent shall promptly transmit to each other Lender). Thereafter (A) the obligation of the Affected Lender to make Revolving Loans as, or to convert Revolving Loans to, Eurodollar Rate Loans shall be suspended until such notice shall be withdrawn by the Affected Lender, (B) to the extent such determination by the Affected Lender relates to a Eurodollar Rate Loan then being requested by Borrower pursuant to a Borrowing Notice or a conversion/continuation notice, the Affected Lender shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) a Base Rate Loan, (C) the Affected Lender's obligation to maintain its outstanding Eurodollar Rate Loans (the "**Affected Loans**") shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (D) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Rate Loan then being requested by Borrower pursuant to a

*DIP Credit Agreement*

Borrowing Notice or a conversion/continuation notice, Borrower shall have the option, subject to the provisions of Section 2.12(c), to rescind such Borrowing Notice or conversion/continuation notice as to all Lenders by giving notice (by telefacsimile or by telephone confirmed in writing) to DIP Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission DIP Agent shall promptly transmit to each other Lender). Except as provided in the immediately preceding sentence, nothing in this Section 2.12(b) shall affect the obligation of any Lender other than an Affected Lender to make or maintain Revolving Loans as, or to convert Revolving Loans to, Eurodollar Rate Loans in accordance with the terms hereof.

(c)     Compensation for Breakage or Non-Commencement of Interest Periods. Borrower shall compensate each Lender, upon written request by such Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid or calculated to be due and payable by such Lender to lenders of funds borrowed by it to make or carry its Eurodollar Rate Loans and any loss, expense or liability sustained by such Lender in connection with the liquidation or re-employment of such funds but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender) a Borrowing of any Eurodollar Rate Loan does not occur on a date specified therefor in a Borrowing Notice or a telephonic request for Borrowing, or a conversion to or continuation of any Eurodollar Rate Loan does not occur on a date specified therefor in a conversion/continuation notice or a telephonic request for conversion or continuation; (ii) if any prepayment or other principal payment of, or any conversion of, any of its Eurodollar Rate Loans occurs on any day other than the last day of an Interest Period applicable to that Eurodollar Rate Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise); or (iii) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of prepayment given by Borrower.

(d)     Booking of Eurodollar Rate Loans.  Any Lender may make, carry or transfer Eurodollar Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Lender.

**Section 2.13   *Pro Rata* Treatment.**

Except to the extent otherwise provided herein, each Revolving Loan shall be made by the Lenders in accordance with their respective *Pro Rata* Shares, and (a) each payment or prepayment by Borrower of principal, (b) each payment by Borrower of interest, and (c) each payment by Borrower of any fees and expenses payable to Lenders (and not to DIP Agent or a Lender alone) shall be made to the Lenders *pro rata* in accordance with their respective *Pro Rata* Shares.

**Section 2.14   Superpriority Nature of Obligations and Lenders' Liens.**

(a)     The priority of DIP Agent's Liens on the Collateral shall be as set forth in the Final Order, which shall reflect the provisions as set forth in this Section 2.14.

(b)     Each Debtor hereby covenants, represents and warrants that, upon entry of the Final Order, all Obligations will be (subject, in each of clauses (i) through (iv) below, to the Carve-Out):

(i)     entitled to a Superpriority Claim, junior only to the Carve-Out, pursuant to Section 364(c)(1) of the Bankruptcy Code;

(ii)     pursuant to Section 364(c)(2) of the Bankruptcy Code, at all times secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and Lien on all unencumbered pre- and post-petition tangible and intangible property of the Debtors' estates in the Chapter 11 Cases of any nature whatsoever (both real and personal), whether existing on the Petition Date or thereafter acquired, and the proceeds thereof, wherever located that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable Liens, including, without limitation, all cash and cash collateral of the Debtors (whether maintained with DIP Agent or otherwise) and any investment of such cash and cash collateral, all present and future accounts receivable, tax refund claims, Net Insurance/Condemnation Proceeds or any rights to payment whether arising before or after the Petition Date, inventory, general intangibles, chattel paper, contracts, documents, instruments, interests in leaseholds, real properties, fixtures, machinery and equipment, vehicles, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property,  Capital Stock of any Subsidiaries of Borrower, the Parent Entities and Holdings, and the proceeds of the foregoing;

(iii)     pursuant to Section 364(c)(3) of the Bankruptcy Code, at all times secured by valid, binding, continuing, enforceable and fully-perfected second priority, junior security interests and junior Liens on all pre- and post-petition property of the Debtors (other than the property described in clauses (ii) and (iv) of this Section 2.14(b), as to which the Liens and security interests in favor of the DIP Agent will be as described in such clauses), whether now existing or hereafter acquired, that are subject to valid, perfected and non-avoidable Liens in existence on the Petition Date or to valid Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code; and

(iv)     pursuant to Section 364(d)(1) of the Bankruptcy Code, at all times secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior priming security interest in, and a senior priming Lien on, all of the tangible and intangible pre- and post-petition property of the Debtors, including without limitation, (A) such property of the Debtors described in clause (ii) of this Section 2.14(b) above, (B) 100% of the Capital Stock of the Subsidiary Guarantors, (C) 100% of the Capital Stock of Borrower, (D) 100% of the Capital Stock of the Parent Entities, (E) the Designated Account and all cash contained therein, (F) the Operating Accounts and all cash contained therein, (G) in the proceeds of any Avoidance Actions and (H) the proceeds of the foregoing, whether now existing or hereafter acquired that is subject to any existing Liens (whether or not valid or perfected) including, without limitation, the liens securing the obligations under the Prepetition Facility and the Adequate Protection Obligations (as such term is defined in the Final Order).

*DIP Credit Agreement*

The assets listed in clauses (i), (ii), (iii) and (iv) of this Section 2.14(b), collectively, the "**Collateral**".

(c)     DIP Agent's and the Lenders' Liens on the Collateral owned by the Debtors and their administrative claim under Sections 364(c)(1) of the Bankruptcy Code afforded the Obligations shall be subject and subordinate only to a carve-out for the following (herein after referred to as the "**Carve-Out**"): (i) an amount which may be used to pay (x) all fees required to be paid to the clerk of the Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (y) all allowed but unpaid fees and expenses incurred by professionals (collectively, the "**Professionals**") of the Debtors, in respect of allowances of compensation for services rendered or reimbursement of expenses awarded by the Court to the Professionals, in an aggregate amount for this clause (i) not to exceed $2,500,000; and (ii) an amount which may be used to pay all allowed but unpaid fees and expenses incurred by any statutory committee appointed in the Case (each, a "**Committee**"), in respect of (x) allowances of compensation for services rendered or reimbursement of fees and expenses awarded by the Court to the Professionals and (y) the reimbursement of expenses allowed by the Court incurred by the Committee members in the performance of their duties (but excluding fees and expenses of third party professionals employed by such members), in an aggregate amount for this clause (ii) not to exceed $550,000.

Notwithstanding the foregoing, (i) no portion of the Carve Out (x) is to be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of action against the Pre-Petition Agent, the Pre-Petition Lenders, DIP Agent or the Lenders, and/or challenging or raising any defenses to the Pre-Petition obligations under the Pre-Petition Facility, the Obligations set forth herein and in the other Loan Documents, or the liens of the Pre-Petition Agent, the Pre-Petition Lenders, DIP Agent or the Lenders; or (y) shall include any fees or disbursements arising after the conversion of the Chapter 11 cases to cases under chapter 7 of the Bankruptcy Code; and (ii) nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in this clause (c).

(d)     Except as set forth herein or in the Final Order, no other claim having a priority superior to or *pari passu* with that granted to Lenders by the Final Order shall be granted or approved while any Obligations under this Agreement remain outstanding.

(e)     Subject to the priorities set forth in subsection (a) above and to the Carve-Out, as to all Collateral, including, without limitation, all real property the title to which is held by the Debtors, or the possession of which is held by any Debtor pursuant to a leasehold interest, each Debtor hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto DIP Agent, on behalf of the Lenders, all of the right, title and interest of the Debtors in all of such Collateral, including without limitation, all owned real property and in all such leasehold interests, together in each case with all of the right, title and interest of the Debtors in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof.  Each Debtor acknowledges that, pursuant to the Final Order, the Liens granted in favor of DIP Agent (on behalf of the Lenders) in all of the Collateral shall be perfected without the recordation of

*DIP Credit Agreement*

any Uniform Commercial Code financing statements, notices of Lien, title certificates, other instruments of mortgage or assignment or any Control Agreement.  Notwithstanding subsections (a), (b) and (c) of this Section 2.14, or any failure on the part of any Debtor and DIP Agent to take any further act to perfect, maintain, protect or enforce the Liens and security interests in the Collateral granted hereunder, the Final Order (when entered) shall automatically, and without further action by any Person, perfect such Liens and security interests against the Collateral. Each Debtor further agrees that (i) DIP Agent shall have rights and remedies set forth in Section 8.2 in respect of the Collateral and (ii) if requested by DIP Agent, the Debtors shall enter into separate security agreements, Control Agreements, pledge agreements and fee and leasehold mortgages with respect to such Collateral on terms reasonably satisfactory to counsel to DIP Agent and counsel to Lenders.

## ARTICLE III

### CONDITIONS PRECEDENT

**Section 3.1    Conditions to the Closing Date.**

The effectiveness of this Agreement on the Closing Date, or to take, fulfill or perform any other action hereunder, is subject to the satisfaction or waiver, in a manner satisfactory to DIP Agent and the Lenders, of the following conditions:

(a)    Credit Agreement; Other Loan Documents.    This Agreement, the Guaranty and the Security Agreement and the counterparts thereof shall have been duly executed by Holdings, the Parent Entities, Borrower, each Subsidiary Guarantor, DIP Agent and each Lender party hereto as of the date hereof, and delivered to DIP Agent, together with all schedules and exhibits hereto.

(b)    Organizational Certificate.    DIP Agent shall have received from each Debtor a certificate duly executed by a Responsible Officer of each Debtor, in form and substance satisfactory to DIP Agent, attaching:  (i) copies of such Debtor's Governing Documents, and certifying that such documents are true, correct and complete copies thereof and are and will be in full force and effect as of the Closing Date after giving effect to the transactions contemplated by this Agreement, (ii) resolutions of such Debtor's Board of Directors in form and substance satisfactory to DIP Agent, approving and authorizing the execution and delivery of this Agreement and the other Loan Documents to which such Debtor is a party and the performance by such Debtor of its obligations hereunder and thereunder, and certifying that such resolutions are in full force and effect as of the Closing Date and are the only resolutions pertaining to the subject thereof, and (iii) the signatures of each officer, manager or other authorized signatory of such Debtor, and certifying that such signatories are authorized to execute and deliver the Loan Documents and that the signatures opposite the names of such signatories are true and correct signatures.

(c)    Officer's Certificate. DIP Agent shall have received from each Debtor a certificate duly executed by a Responsible Officer of Borrower, on its behalf and on behalf and as manager of each other Debtor, meeting the requirements of Section 11.16 and certifying that,

548336.10/2576-00015                                                           *DIP Credit Agreement*

as of the Closing Date: (i) each representation by or warranty of such Debtor contained herein and in each other Loan Document is true and correct in all material respects as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case such certificate shall certify that such representation or warranty was true and correct in all material respects as of such earlier date, and (ii) no Default or Event of Default has occurred and is continuing.

(d)     <u>Payment of Fees and Expenses</u>.  DIP Agent and the Lenders shall have received all of the legal fees and other fees, costs and other Lender Group Expenses incurred by DIP Agent or any Lender that are reimbursable by Borrower pursuant to <u>Section 11.5</u> or otherwise pursuant to the Loan Documents and the Fee Letter as of the Closing Date.

(e)     <u>Initial Budget</u>.  DIP Agent shall have received the Initial Budget, which Initial Budget shall be in form and substance satisfactory to DIP Agent.

(f)     <u>Security Interest</u>.  DIP Agent shall have received evidence that each Debtor shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument and made or caused to be made any other filing and recording (other than as set forth herein) necessary or reasonably required by DIP Agent in order to grant to DIP Agent the security interest in the Collateral contemplated by <u>Section 2.14</u>.

(g)     <u>Motions and Other Pleadings</u>.  Prior to filing or submission to the Bankruptcy Court, counsel to the Lenders shall have received the motions and other pleadings or related documents to be filed or submitted to the Bankruptcy Court in connection with this Agreement and the other Loan Documents and the approval thereof, and such motions, orders, pleadings and related documents shall be reasonably satisfactory in all respects to such counsel.

(h)     <u>Opinions of Counsel to Debtors</u>.  DIP Agent shall have received originally executed copies of the favorable written opinions of Weil, Gotshal & Manges LLP, counsel for Debtors, dated as of the Closing Date and in form and substance reasonably satisfactory to DIP Agent and Lenders (and each Debtor hereby instructs such counsel to deliver such opinions to DIP Agent on behalf of the Lenders).

(i)     <u>Representations and Warranties</u>. Each of the representations and warranties set forth in this Agreement and in each other Loan Document shall be true and correct in all material respects on the Closing Date, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and warranty shall have been true and correct in all material respects as of such earlier date.

(j)     <u>No Default</u>.  No Default or Event of Default shall have occurred and be continuing on the Closing Date.

(k)     <u>Upfront Fee</u>.  Borrower shall have paid to Lenders an upfront fee in an amount equal to 5.00% of the total Revolving Commitment as of the Closing Date, payable on the date of the Final Order, which upfront fee shall be paid to DIP Agent and upon receipt, DIP Agent shall promptly distribute to each Lender its *Pro Rata* Share thereof.

*DIP Credit Agreement*

**Section 3.2    Conditions to All Borrowings.**

The obligation of the Lenders to fund its portion of the Revolving Loan Commitments, or to take, fulfill or perform any other action hereunder, is subject to the satisfaction or waiver, in a manner satisfactory to DIP Agent and Required Lenders, of the following conditions:

(a)    <u>Final Order</u>.  The Bankruptcy Court shall have entered the Final Order, which shall not have been reversed, modified, amended or stayed, and shall otherwise be in full force and effect within (30) days following the Petition Date.  The Final Order shall be in form and substance satisfactory to DIP Agent and the Lenders in their sole discretion and shall:

(i)    approve the terms and conditions of this Agreement, the transactions contemplated hereby and grant a perfected security interest in the Collateral with the priority described in <u>Section 2.14</u> and find that the Lenders are extending credit to Borrower in good faith within the meaning of Section 364(e) of the Bankruptcy Code;

(ii)    preclude any priming of any Lien of DIP Agent and the Lenders, other than pursuant to this Agreement and the other Loan Documents; and

(iii)    have been entered upon an application of the Loan Parties reasonably satisfactory in form and substance to the Lenders.

(b)    Borrower shall deliver evidence to DIP Agent that the aggregate amount of cash and Cash Equivalents held by the Debtors is less than $8,500,000.

(c)    <u>Representations and Warranties</u>.  Each of the representations and warranties set forth in this Agreement and in each other Loan Document shall be true and correct in all material respects on the applicable date of the Borrowing, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and warranty shall have been true and correct in all material respects as of such earlier date.

(d)    <u>No Default</u>.  No Default or Event of Default shall have occurred and be continuing on the applicable date of the Borrowing, and no event or condition shall have occurred or be existing which would reasonably be expected to result in a Default or an Event of Default after giving effect to the subsequent Revolving Loan made on the applicable date of the Borrowing.

(e)    <u>Borrowing Notice</u>.  DIP Agent shall have received a duly executed Borrowing Notice from Borrower.

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

To induce DIP Agent and the Lenders to provide the financing arrangements contemplated by this Agreement and to undertake their respective obligations hereunder and under the other Loan Documents, each Debtor makes the following representations and warranties to DIP Agent and the Lenders, subject to entry by the Bankruptcy Court of the Final Order, where applicable, and each and all of which representations and warranties shall survive the execution and delivery of this Agreement:

**Section 4.1    Organization and Qualification.**

Borrower and each Guarantor (other than Holdings) is an entity duly organized and validly existing in good standing under the laws of the State of Texas and Holdings is an entity duly organized and validly existing in good standing under the laws of the State of Delaware.  Each Debtor has the requisite organizational power and authorization to own or lease its properties and to carry on its business as now being conducted.  Each Debtor is duly qualified as a foreign entity to do business and is in good standing in every jurisdiction (other than the jurisdiction of its organization) in which its ownership of property or the nature of the business conducted by it makes such qualification necessary, except to the extent that the failure to be so qualified or be in good standing would not have a Material Adverse Effect.

**Section 4.2    Executive Offices; Collateral Locations; FEIN; Organizational Information.**

Schedule 4.2 sets forth the current location of each Debtor's chief executive office, principal place of business, the locations at which any Collateral is stored or located, and the location of each Debtor's books and records concerning such Collateral.  In addition, Schedule 4.2 sets forth (a) each Debtor's federal employer identification number, (b) the organizational identification number issued by the Governmental Authority of the jurisdiction of organization of each Debtor, as applicable, (c) the exact legal name of each Debtor, and (d) any other corporate, fictitious or trade names used by such Debtor currently or at any time prior to the date of this Agreement.

**Section 4.3    Authorization; Enforcement; Validity.**

(a)    Each Debtor has the requisite corporate power and authority to enter into and perform its obligations under this Agreement, the Guaranty and the Security Agreement and each of the other Loan Documents to which it is a party.  The execution and delivery of the Loan Documents by each Debtor (as applicable) and the consummation by each Debtor (as applicable) of the transactions contemplated hereby and thereby, including, without limitation, the incurrence of the Obligations and any guarantee thereof and the granting of a security interest in the Collateral under the Loan Documents, have been duly authorized by the Board of Directors of each Debtor (as applicable); and

(b)    Each Debtor has duly executed and delivered each of this Agreement and the other Loan Documents to which it is a party.  This Agreement and each such other Loan

Document constitutes the legal, valid and binding obligations of the Debtors, enforceable against each Debtor in accordance with their respective terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

**Section 4.4      No Conflicts.**

The execution, delivery and performance by each Debtor of the Loan Documents to which it is a party and the consummation by the Debtors of the transactions contemplated hereby and thereby (including, without limitation, the granting of security interests in the Collateral under the Security Agreement) will not (a) result in a violation of the memorandum of association, certificate of designation, by-laws or any other organizational documents of each Debtor, (b) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture, mortgage, deed of trust, loan agreement or instrument to which any Debtor is a party or by which any property or asset of any Debtor is bound, or (c) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws) applicable to any Debtor or by which any property or asset of any Debtor is bound.

**Section 4.5      No Default.**

Except to the extent any such default would not have a Material Adverse Effect, no Debtor is in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default in the due performance or observance of any material term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject, except as would not reasonably be expected to have a Material Adverse Effect and, in each case, any defaults occurring as a result of the filing of the Chapter 11 Cases.

**Section 4.6      Consents.**

No Debtor is required to obtain any consent, approval, authorization or order of, or make any filing or registration with, any court, governmental agency or any regulatory or self-regulatory agency or any other Person or other Governmental Authority in order for it to execute, deliver or perform any of its obligations hereunder or under the Loan Documents, in each case in accordance with the terms hereof or thereof.  All consents, approvals, authorizations, orders, filings and registrations, which any Debtor is required to obtain prior to the Closing Date will have been obtained or effected on or prior to the Closing Date, and no Debtor is aware of any facts or circumstances which might prevent such Debtor from obtaining or effecting any of the registration, application, approvals or filings pursuant to the preceding sentence.

*DIP Credit Agreement*

548336.10/2576-00015

**Section 4.7     Conduct of Business; Regulatory Permits.**

No Debtor is in violation of any term of or in default under its memorandum of association, certificate of designation, by-laws or other organizational document other than any violations or defaults occurring as a result of the filing of the Chapter 11 Cases.  Except to the extent any such violation would not have a Material Adverse Effect, no Debtor is in violation of any judgment, decree or order or any statute, ordinance, rule or regulation applicable to such Debtor, and no Debtor will conduct its business in violation of any of the foregoing.  Except to the extent any such failure to possess the same would not have a Material Adverse Effect, each Debtor possesses all certificates, authorizations and permits issued by the appropriate regulatory authorities necessary to conduct their respective businesses, and no Debtor has received any notice of proceedings relating to the revocation or modification of any such certificate, authorization or permit.

**Section 4.8     Foreign Corrupt Practices.**

None of the Debtors, any of their respective directors and officers or, to the knowledge of the Debtors, any agent, employee or other Person acting on behalf of the Debtors, has, in the course of its actions for, or on behalf of, any Debtor (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

**Section 4.9     Permitted Debt; Permitted Liens.**

(a)     No Debtor has any outstanding Indebtedness, other than Permitted Debt.

(b)     There are no Liens or financing statements securing Indebtedness of the Debtors, except for Permitted Liens.

**Section 4.10    Litigation.**

Except as set forth on Schedule 4.10 and except for the Chapter 11 Cases, there is no action, suit, proceeding, inquiry or investigation before or by any court, public board, government agency, self-regulatory organization or body pending or, to the best knowledge of the Debtors, threatened against any other Debtor or any of the officers or directors of any of the Debtors in their capacities, as such in each case which could reasonably be expected to have a Material Adverse Effect.

**Section 4.11    Insurance.**

Each Debtor is insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as management of Borrower believes to be prudent and customary in the businesses in which the Debtors are currently are engaged, in each case as

41

set forth on Schedule 4.11.  No Debtor has been refused any insurance coverage for which it applied that is material to the business of such Debtor, and no Debtor has received notice from any insurer or agent of such insurer that capital improvements or other expenditures are required or necessary to be made in order to continue applicable insurance coverage, and no Debtor has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business.

**Section 4.12   Employee Relations.**

No Debtor is a party to any collective bargaining agreement or, to their knowledge, employs any member of a union.  Each Debtor is in compliance with all federal, state, provincial, local and foreign laws and regulations respecting labor, employment and employment practices and benefits, terms and conditions of employment and wages and hours, except to the extent any non-compliance therewith would not have a Material Adverse Effect. No strike, work stoppage or material work slowdown by employees of any Debtor exists or, to the best knowledge of such Debtor, is contemplated or threatened.

**Section 4.13   Title.**

Each Debtor has good and marketable title to all real property and personal property owned by it that is material to the respective businesses of such Persons, in each case free and clear of all Liens, encumbrances and defects except Permitted Liens.  All personal property and real property and facilities held under lease by the Debtors are held by them under valid, subsisting and enforceable leases with such exceptions as are not material and do not interfere with the use made or proposed to be made of such property and buildings.

**Section 4.14   Environmental Laws.**

Each Debtor (a) is in compliance with any and all Environmental Laws, (b) has received all permits, licenses or other approvals currently required of them under applicable Environmental Laws to conduct their respective businesses and (c) is in compliance with all terms and conditions of any such permit, license or approval, except where failure to comply or obtain such permits, licenses or other approvals would not reasonably be expected to have a Material Adverse Effect.  None of the Debtors are aware of any claims or potential claims against such Debtor arising under Environmental Laws (including any potential claims by any governmental agency or third-parties for clean-up of properties).

**Section 4.15   Tax Status.**

Except to the extent any failure to take any of the following actions would not have a Material Adverse Effect, each Debtor (a) has made or filed all material foreign, federal, state, local and provincial income and all other tax returns, reports and declarations required to be made or filed by it by any jurisdiction to which it is subject, (b) has paid all taxes and other governmental assessments and charges that are due (whether or not shown as due) and payable by it on such returns, reports and declarations, except those being contested in good faith for which adequate reserves have been accrued on Holdings' latest consolidated balance sheet in

*DIP Credit Agreement*

accordance with GAAP and (c) has set aside on its books provisions reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply and which such taxes are not yet due and payable.  To the knowledge of each Debtor, there are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction.  To the knowledge of each Debtor, there are no Liens with respect to any taxes upon any of the assets or properties of such Debtor other than for taxes that are not yet due and payable.  There are no tax returns of the Debtors that are currently being audited by any state, local, federal or foreign tax authorities or agencies.

**Section 4.16    Investment Company.**

None of Debtors are any entity which either "controls" (as defined by the Investment Company Act), or, after giving effect to any transaction contemplated hereby or by the other Loan Documents, including the making of any Revolving Loans or and the application of the proceeds thereof, will be, required to seek an order permitting registration, under the Investment Company Act.  No entity that is organized under any "State" (as defined in the Investment Company Act) and that is "controlled" (as defined by the Investment Company Act) by Borrower or Guarantors are required to register under the Investment Company Act.

**Section 4.17    Disclosure of Information.**

(a)    All factual information furnished by or on behalf of the Debtors in writing to DIP Agent or any Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement, the other Loan Documents, or any transaction contemplated herein or therein is, and all other such factual information hereafter furnished by or on behalf of the Debtors in writing to DIP Agent or any Lender will be, when taken as a whole, true and accurate in all material respects on the date as of which such information is dated or certified, does not contain as of the date hereof, when taken as a whole, any untrue statement of a material fact, and as of such date did not omit, and does not omit as of the date hereof, to state a material fact necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading.

(b)    The Initial Budget has been prepared in good faith based upon assumptions which the Debtors believe to be reasonable assumptions.

**Section 4.18    Employment Benefit Plans.**

No Debtor has ever maintained or contributed to, or had any obligation to contribute to (or borne any liability with respect to) any Employee Benefit Plan, and no Debtor has incurred, and no event has occurred and no condition or circumstance exists that could result, directly or indirectly, in, any unsatisfactory liability (including, without limitation, any indirect, contingent or secondary liability) of such Debtor under Title IV of ERISA or Section 412 of the IRC or Section 302 of ERISA arising in connection with any employee benefit plan covered or previously covered by Title IV of ERISA or such sections of the Code or ERISA.

**Section 4.19    Margin Rules.**

Neither the making of any Revolving Loan under this Agreement nor the application of the proceeds thereof nor the consummation of any other transaction contemplated hereby or by any of the other Loan Documents will violate Regulation T, U or X of the Board of Governors of the Federal Reserve System or any other regulation of such Board of Governors.

**Section 4.20    Government Regulations.**

No Debtor is subject to any federal, state, or local law, rule, regulation or order issued by any Governmental Authority that restricts or limits such Debtor's ability to incur Indebtedness or to perform its obligations hereunder.  The performance by the Debtors, DIP Agent and the Lenders of their respective obligations under the Loan Documents will not, to the knowledge of the Debtors, violate any provision of any federal, state, or local law, rule, regulation or order issued by any Governmental Authority.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Each Debtor agrees that until termination of all of the Revolving Loan Commitments and payment in full of the Obligations:

**Section 5.1    Financial Statements, Reports, Certificates, Etc.**

Borrower shall deliver, or shall cause to be delivered, to DIP Agent and each Lender (or to an Affiliate of DIP Agent or any Lender, if DIP Agent or such Lender, as the case may be, shall designate in writing) Financial Statements, notices, and other information as follows:

(a)    <u>Balance Sheet</u>.  As soon as possible, and in any event when the Debtors' statement of financial affairs and schedules of assets and liabilities are required to be filed with the Bankruptcy Court (but no later than thirty-five (35) days after the Petition Date or such later date as approved by the Bankruptcy Court), a consolidated pro forma balance sheet of the Debtors' financial condition as of October 31, 2009.

(b)    <u>Certain Filings</u>.  Copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Debtors with the Bankruptcy Court in the Chapter 11 Cases, or distributed by or on behalf of the Debtors to any official committee appointed in the Chapter 11 Cases.

(c)    <u>Certain Financial Statements</u>.  Borrower shall supply to DIP Agent (a) as soon as the same become available, but in any event within ninety (90) days after the end of each fiscal year of Borrower, its audited consolidated financial statements for that fiscal year; (b) as soon as available, and in any event within forty-five (45) days after the end of each fiscal quarter of Borrower, its unaudited consolidated balance sheet as at the end of such fiscal quarter and the related unaudited consolidated statements of income, consolidated statements of stockholders'

equity and consolidated statements of cash flows; and (c) as soon as available, and in any event within thirty (30) days after the end of each month, its unaudited consolidated balance sheet as at the end of such month and the related unaudited consolidated statements of income, consolidated statements of stockholders' equity and consolidated statements of cash flows.

(d)     <u>Weekly Report</u>.   The Debtors shall, on Wednesday   of each week (commencing with the first Wednesday following the Closing Date) deliver  to DIP Agent and Lenders a report (the "**<u>Weekly Report</u>**"), reasonably satisfactory to DIP Agent and the Lenders, and which shall contain a reconciliation of the actual results for the immediately preceding week period to the most recently delivered Budget for such immediately preceding week and a detailed explanation of all material variances (in excess of 15%) from such Budget for such week and on a cumulative basis.

(e)     <u>Default Notices</u>.   Borrower shall, so long as any of the Obligations are outstanding or any of the Revolving Loan Commitments shall exist, promptly deliver to DIP Agent, forthwith upon any Officer becoming aware of any Default or Event of Default, an Officer's Certificate meeting the requirements of <u>Section 11.16</u> and specifying such Default or Event of Default and what action Borrower is taking or proposes to take with respect thereto.

(f)     <u>Management Letters</u>.  Within five (5) Business Days after receipt thereof, Debtors shall deliver to DIP Agent copies of any management letters, exception reports or similar letters or reports, if any, received by any Debtor from its independent certified public accountant.

(g)     <u>Litigation</u>. Promptly upon learning thereof, but in any event within five (5) days after the service of process with respect thereto on any Debtor, Borrower shall deliver to DIP Agent written notice of any action, suit, or proceeding brought by or against any Debtor by or before any Governmental Authority which if successful reasonably could be expected to have a Material Adverse Effect.

(h)     <u>Insurance Notices</u>.   Promptly upon learning thereof, Borrower shall provide to DIP Agent disclosure of any losses or casualties required to be covered by insurance in accordance with <u>Section 5.10</u> of this Agreement and which losses or casualties are in excess of $500,000 in the aggregate.

(i)     <u>Material Events</u>.  Within two (2) Business Days of Borrower's acquiring knowledge thereof, Borrower shall deliver to DIP Agent notice of any events that could cause (A) a material adverse change in projected revenue, (B) a material dilution in the value of the Collateral or (C) a Material Adverse Effect.

(j)     <u>Other Documents</u>.  Each Debtor shall furnish to DIP Agent, such other financial and other information respecting such Debtor's business or financial condition as DIP Agent or any Lender shall from time to time reasonably request, including without limitation, financial reports in form and substance reasonably satisfactory to DIP

*DIP Credit Agreement*

**Section 5.2    Budgets.**

(a)    On or before the Closing Date, Holdings shall deliver to DIP Agent and Lenders a pro forma rolling thirteen (13) week cash flow budget for Holdings and its Subsidiaries on a consolidated basis, which budget shall (x) be satisfactory in all respects to DIP Agent and the Lenders in their sole discretion and (y) be substantially in the form of the Budget attached hereto as <u>Schedule 5.2(a)</u> (the first such budget delivered, the "**<u>Initial Budget</u>**").

(b)    Commencing on December 7, 2009 and no later than the fifth (5th) Business Day of each calendar month thereafter, Holdings shall deliver to DIP Agent and Lenders, an updated pro forma rolling thirteen (13) week cash flow budget (each a **"<u>Subsequent Budget</u>"** and together with the Initial Budget, the "**<u>Budgets</u>**"), in each case, prepared on a basis consistent with the Initial Budget and satisfactory to DIP Agent and the Lenders in their sole discretion.

(c)    All payments shall be made and expenses incurred in accordance with the Budgets.

**Section 5.3    Access.**

The Debtors shall (a) upon one (1) Business Day's prior notice, provide access to DIP Agent or any Lender, any Affiliate of DIP Agent or such Lender or the financial advisors and any other consultants engaged from time to time at the direction of DIP Agent, to visit the offices of such Debtor at such reasonable times and intervals as DIP Agent may designate, and inspect, audit and make extracts from the financial and accounting records, books, journals, orders, receipts, correspondence (other than privileged correspondence with legal counsel) of such Debtor and other data concerning the business of such Debtor, and (b) upon three (3) Business Day's prior notice, provide such access to such Persons at the times set forth in clause (a) above to discuss the affairs, finances and business of such Debtor with the officers, managers and/or independent public accountants of such Debtor.  If a Default or Event of Default has occurred and is continuing, such Debtor shall provide such access at all times and without advance notice.  Each Debtor shall promptly make available originals or copies of all books and records which DIP Agent or any Lender may request.  Each Debtor shall deliver any document or instrument necessary for DIP Agent or any Lender, as it may from time to time request, to obtain records from any service bureau or other Person which maintains records for such Debtor, and shall maintain duplicate records or supporting documentation on media, including computer tapes and discs owned by such Debtor.

**Section 5.4    Maintenance of Properties, Licenses and Permits.**

Except as set forth on <u>Schedule 5.4</u>, each Debtor shall:  (a) maintain and preserve all of their properties which are necessary or useful in the proper conduct to their business in good working order and condition, ordinary wear, tear, and casualty excepted, in each case, except where the failure to do so could not be expected to result in a Material Adverse Effect, and (b) maintain and preserve in full force and effect all licenses, franchises, permits and approvals now held or hereafter acquired by such Debtor which, in each case, are necessary or

useful in the operation of its business, except where the failure to do so could not be expected to result in a Material Adverse Effect.

**Section 5.5     Compliance with Laws.**

Each Debtor shall comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to cause a Material Adverse Effect.

**Section 5.6     Corporate Existence.**

Except as set forth on <u>Schedule 5.6</u>, each Debtor shall cause to be done all things necessary to preserve and keep in full force and effect (i) its corporate, partnership or limited liability company (as applicable) existence in accordance with the respective organizational documents (as the same may be amended from time to time) of such Debtor and (ii) the rights (charter and statutory), licenses and franchises of such Debtor.

**Section 5.7     Use of Proceeds.**

The Debtors shall utilize the proceeds of the Revolving Loans solely to fund ordinary course post-petition operating expenses and other working capital and financing requirements of the Debtors as set forth in the applicable Budget.   Notwithstanding the foregoing, no portion of the Revolving Loans is to be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with (a) asserting or preparing for any claims or causes of action against (i) DIP Agent, (ii) the Lenders or (iii) the Pre-Petition Agent or the Pre-Petition Lenders, and/or (b) challenging or raising any defenses to the pre-petition obligations under the Pre-Petition Facility, the Obligations under this Agreement or the other Loan Documents or the Liens of the Pre-Petition Agent, the Pre-Petition Lenders, DIP Agent or the Lenders.

**Section 5.8     Disclosure Updates.**

Promptly and in no event later than five (5) Business Days after obtaining knowledge thereof, the Debtors shall notify DIP Agent if any written information, exhibit, or report furnished by any Debtor to the Lender Group or any member thereof, when taken as a whole, contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made.  The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any other Loan Document or any of the Schedules hereto or thereto.

*DIP Credit Agreement*

**Section 5.9      Taxes.**

Each Debtor shall pay, prior to delinquency, all material Taxes, assessments, and governmental levies except such as are contested in good faith and by appropriate proceedings or where the failure to effect such payment could not reasonably be expected to cause a Material Adverse Effect.

**Section 5.10    Maintenance of Insurance.**

Each Debtor shall maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses, which insurance shall be reasonably satisfactory in all respects to DIP Agent and the Lenders (it being understood that the insurance set forth on Schedule 4.11 is reasonably satisfactory in all respects).

**Section 5.11    Further Assurances.**

Each Debtor agrees that it will, at the expense of Borrower, (a) duly execute and deliver, or cause to be duly executed and delivered, to DIP Agent such further agreements, assignments, certificates, instruments and documents, including, without limitation, (i) the certificates representing the shares of Capital Stock of Borrower and the Subsidiary Guarantors and the Parent Entities, together with an undated stock power for each such certificate executed in blank by a duly authorized officer by the holder thereof, and (ii) any amendments or supplements to the Loan Documents to reflect changes in the composition or location of Collateral any and all financing statements, fixture filings, security agreements, pledges, Control Agreements, assignments, mortgages, deeds of trust, opinions of counsel, and all other documents (collectively, the "**Additional Documents**") that DIP Agent may reasonably request in form and substance reasonably satisfactory to counsel to DIP Agent and Lenders to create, perfect, and continue perfected DIP Agent's Liens in all of the properties and assets of Borrower and the other Debtors (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), or to create and perfect Liens in favor of DIP Agent in any real property or interests in real property acquired by the Debtors after the Closing Date, and (b) do and cause to be done such further acts, as may be reasonably necessary or proper in the reasonable opinion of DIP Agent or the Lenders to carry out more effectively the provisions and purposes of this Agreement or any of the Loan Documents.  To the maximum extent permitted by applicable law, each Debtor authorizes DIP Agent to execute any such Additional Documents in its name, as applicable, and authorizes DIP Agent to file such executed Additional Documents in any appropriate filing office.  Notwithstanding anything herein to the contrary, DIP Agent shall have no responsibility for preparing, recording, filing, re-recording or refiling any financing statement, continuation statement or other instrument in any public office.

*DIP Credit Agreement*

## ARTICLE VI

## NEGATIVE COVENANTS

Each Debtor agrees that until the termination of all of the Revolving Loan Commitments and payment in full of the Obligations:

**Section 6.1    Incurrence of Indebtedness.**

Each Debtor shall not directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to any Indebtedness, except (collectively, "**Permitted Debt**"):

(a)    Indebtedness created hereunder and under the Loan Documents;

(b)    Indebtedness under the Pre-Petition Facility;

(c)    any Indebtedness contemplated by the Budgets;

(d)    Indebtedness outstanding on the Closing Date and set forth on <u>Schedule 6.1</u> and any Permitted Refinancing of such Indebtedness;

(e)    Indebtedness under performance, stay, customs, appeal and surety bonds or with respect to workers' compensation or other like employee benefit claims, in each case incurred in the ordinary course of business, and obligations in respect of letters of credit related thereto;

(f)    letters of credit issued to insurance providers on behalf of any Debtor or its Subsidiaries in the ordinary course of business and consistent with the past practice of the Debtors and their Subsidiaries;

(g)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business; <u>provided</u> that such Indebtedness is promptly covered by Borrowers or any Subsidiary;

(h)    Guarantees of Indebtedness permitted under this <u>Section 6.1</u>;

(i)    unsecured intercompany Indebtedness of Holdings, any Parent Entity or any of their respective Subsidiaries to the extent permitted by <u>Section 6.3</u>;

(j)    Guarantees in support of bonds in favor of the departments of transportation of various states in an aggregate amount outstanding not to exceed $500,000 at any time;

*DIP Credit Agreement*

(k)      Indebtedness consented to by the Required Lenders and incurred pursuant to orders entered by the Bankruptcy Court, which orders are in form and substance acceptable to the Required Lenders in their sole discretion; and

(l)      Indebtedness not otherwise permitted hereunder in an aggregate amount not to exceed $250,000 at any time outstanding.

**Section 6.2      Asset Sales; Events of Loss.**

(a)      No Debtor shall (i) consolidate or merge with or into another Person (whether or not a Debtor is the surviving corporation or company) or (ii) consummate an Asset Sale in one or more related transactions except Asset Sales, the proceeds of which are less than $3,000,000 when aggregated with the proceeds of all other Asset Sales made from the Closing Date to the date of determination; provided (A) the consideration received for such assets shall be in an amount at least equal to the fair market value thereof (determined in good faith by the board of directors of Borrower (or similar governing body)), (B) no less than 100% thereof shall be paid in cash, and (C) the Net Asset Sale Proceeds thereof shall be applied to the extent required by Section 2.3(b)(i).

(b)      In the event that any Debtor receives proceeds of any insurance, then, Borrower shall promptly repay the Obligations to the extent required by Section 2.3(b)(i).

**Section 6.3      Restricted Payments.**

Each Debtor shall not, directly or indirectly: (i) issue any new Equity Interests or, declare or pay any dividend or make any other payment or distribution on account of such Debtor's Equity Interests or to the direct or indirect holders of such Debtor's Equity Interests in their capacity as such; (ii) purchase, redeem or otherwise acquire or retire for value any Equity Interests of any Debtor; (iii) make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value any Indebtedness of any Debtor that is contractually subordinated to the prior payment in full in cash of all Obligations or any Guarantee thereof; or (iv) make any Investment (all such payments and other actions set forth in clauses (i) through (iv) above being collectively referred to as "**Restricted Payments**") except:

(a)      Investments consisting of the Capital Stock of each Subsidiary owned by Holdings, the Parent Entities and Borrower existing on the Closing Date;

(b)      any Investment in cash and Cash Equivalents;

(c)      any Investments received in compromise or resolution of litigation, arbitration or other disputes;

(d)      Investments made by Borrower to Guarantor of the proceeds from the Designated Account in order to permit Guarantor to make any payments pursuant to the Budgets;

(e)      any Restricted Payments contemplated by the Budgets;

*DIP Credit Agreement*

(f)     Investments consisting of loans or advances made by Borrower or any Guarantor in Borrower or any other Guarantor;

(g)     loans or advances made to, or guarantees given in respect of the obligations of, employees, managers or consultants of Borrower or any Subsidiary in the ordinary course of business and consistent with the past practice of Borrower and its Subsidiaries in an aggregate amount not to exceed $250,000 at any time outstanding;

(h)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business and consistent with the past practice of Borrower and its Subsidiaries and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss; and

(i)     Guarantees permitted by Section 6.1.

## Section 6.4     Dividend and Other Payment Restrictions.

Each Debtor shall not directly or indirectly, create or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Debtor to:  (a) pay dividends or make any other distributions on its Capital Stock to Borrower or with respect to any other interest or participation in, or measured by, its profits, or pay any indebtedness owed to Borrower; (b) make loans or advances to Borrower; or (c) sell, lease or transfer any of its properties or assets to Borrower; except for such encumbrances or restrictions existing under or by reasons of (i) this Agreement and the other Loan Documents (including any Asset Sale permitted hereunder); (ii) applicable law, rule, regulation or order; (iii) customary non-assignment provisions in contracts and licenses entered into in the ordinary course of business; (iv) the Pre-Petition Facility; and (v) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business.

## Section 6.5     Transactions with Affiliates.

Each Debtor shall not (a) make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or for the benefit of, any Affiliate of Borrower or (b) purchase any property or assets from, or enter into or make or amend any contract, agreement, understanding, loan, advance, transaction or guarantee with, or for the benefit of, any Affiliate of Borrower (each of (a) and (b), "**Affiliate Transactions**"); provided however, that any employment agreement, employee benefit or incentive plan, officer or director indemnification agreement or any similar arrangement, including ordinary and necessary travel and expense advances, entered into by the Debtors in the ordinary course of business and payments made pursuant thereto shall not be deemed Affiliate Transactions.

## Section 6.6     Liens.

Each Debtor shall not directly or indirectly create, incur, assume or suffer to exist any Lien of any kind on any asset now owned or hereafter acquired by Holdings and its Subsidiaries, except (collectively, "**Permitted Liens**"):

*DIP Credit Agreement*

(a)      Liens on the Collateral granted in favor of DIP Agent on behalf of the Lenders pursuant to the Final Order and the Loan Documents;

(b)      Liens in favor of the Pre-Petition Agent on behalf of the Pre-Petition Lenders and the other secured parties securing Indebtedness and other obligations under the Pre-Petition Facility;

(c)      Liens in favor of Borrower or any Guarantor (which, to the extent covering Collateral, shall be expressly subordinated to the Liens of DIP Agent);

(d)      Liens to secure the performance of bids, trade contracts, statutory obligations, surety or appeal bonds, performance bonds or other obligations of a like nature incurred in the ordinary course of business;

(e)      Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; provided, that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor;

(f)      Liens imposed by law, such as carriers', warehousemen's, landlord's and mechanics' Liens, in each case, incurred in the ordinary course of business;

(g)      survey exceptions, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real property that were not incurred in connection with Indebtedness and that do not in the aggregate materially detract from the value of said properties or materially impair their use in the operation of the business of such Person;

(h)      Liens set forth on Schedule 6.6 and any renewals or extensions thereof, provided that (i) the property covered thereby is not changed, (ii) the amount secured or benefited thereby is not increased and (iii) any renewal or extension of the obligations secured or benefited thereby is permitted by Section 6.1(d);

(i)      pledges or deposits in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(j)      Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.1(h) or securing appeal or other surety bonds related to such judgments;

(k)      (i) licenses or leases or subleases as licensor, lessor or sublessor of any property, including intellectual property, in the ordinary course of business and not interfering in any respect with the ordinary conduct of business or (ii) any interest or title of a licensor of any property or of a lessor or sublessor under an operating lease or sublease, in each case, entered into in the ordinary course of business and not interfering in any respect with the ordinary conduct of business;

52

(l)      Liens in the form of cash collateral required to secure the issuance of letters of credit permitted by <u>Section 6.1</u>; and

(m)      Liens not otherwise permitted hereunder on assets of the Debtors securing Indebtedness or other obligations which do not exceed $250,000 in the aggregate at any time outstanding.

**Section 6.7      Line of Business.**

Each Debtor shall not engage in any business other than Permitted Businesses.

**Section 6.8      Margin Stock.**

No Debtor shall use any of the proceeds of the Revolving Loans to purchase or carry margin stock (as defined in Regulation U of the Board of Governors of the Federal Reserve System).

**Section 6.9      Material Contracts.**

No Debtor shall amend, modify or waive any of its rights under any agreement material to the operation of its business if such amendment, modification or waiver could reasonably be expected to have a Material Adverse Effect.

**Section 6.10      Creation of Subsidiaries.**

Borrower and each Guarantor shall not form or cause to be formed any other Subsidiary.

**Section 6.11      Bankruptcy Matters.**

(a)      Each Debtor shall not incur, create, assume suffer to exist or permit any other Superpriority Claim or Lien on any Collateral which is *pari passu* with, or senior to, the priority claims of DIP Agent and the Lenders in respect of the Obligations, except as provided in <u>Section 2.14</u> and as set forth in the Final Order.

(b)      Each Debtor shall not at any time, seek, consent to, or suffer to exist, any reversal, modification, amendment, stay, vacation or appeal of any of the Final Order, except for modifications and amendments agreed to by DIP Agent and the Lenders.

(c)      Prior to the date on which the Obligations have been paid in full, each Debtor shall not pay or voluntarily incur (other than as may arise under Section 503(b)(9) of the Bankruptcy Code) any administrative expense claims except (i) as set forth in <u>Section 2.14</u> and the Final Order, (ii) the Obligations and (iii) other administrative expense claims incurred in the ordinary course of business of the Debtor or the Chapter 11 Cases, in each case that is a disbursement made pursuant to the Budgets.

*DIP Credit Agreement*

(d)     Except with the consent of the Lenders, each Debtor shall not (i) make any payment or transfer any property on account of claims asserted by any venders of Borrower or any Guarantor for reclamation in accordance with Section 2-702 of the Code and Section 546(c) of the Bankruptcy Code or (ii) enter into agreements or file any motion seeking a Bankruptcy Court order for the return of property of Borrower or any Guarantor to any vendor under Section 546(g) of the Bankruptcy Code.

(e)     No Debtor shall file any motion or other pleading seeking an extension of such Debtor's exclusive period to file a Reorganization Plan.

**Section 6.12    No Other Payments.**

Each Debtor shall not without the express prior written consent of the Required Lenders or as provided for in the applicable Budget or the Plan Support Agreement, make any payment or transfer with respect to any Lien or Indebtedness incurred or arising prior to the filing of the Chapter 11 Cases that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise, except pursuant to a confirmed Reorganization Plan and except as specifically permitted hereunder.

## ARTICLE VII

### Term

**Section 7.1    Termination.**

(a)     Except to the extent specific provisions of this Agreement terminate at an earlier date pursuant to the terms hereof, notwithstanding anything herein to the contrary, this Agreement shall remain in effect until the Revolving Loans and all other Obligations (other than Obligations that expressly survive the termination of this Agreement pursuant to <u>Section 7.2</u>) have been paid in full in cash and the Facility Maturity Date shall have occurred.

(b)     At the Debtors' expense, upon payment in full in cash and performance of all of the Obligations (other than contingent indemnification Obligations that have not yet arisen and other Obligations which expressly survive this Agreement and the other Loan Documents pursuant to the terms hereof and thereof), and so long as no suits, actions, proceedings, or claims are pending or threatened against any Indemnified Person asserting any damages, losses or liabilities that are Indemnified Liabilities, DIP Agent shall deliver to Borrower termination statements, mortgage releases and other documents necessary or appropriate to evidence the termination of the Liens securing payment of the Obligations.

**Section 7.2    Survival of Obligations Upon Termination of Financing Arrangements.**

Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the obligations, duties and liabilities of the Debtors or the rights of DIP Agent and the Lenders relating to any unpaid portion of the Revolving Loans or any other Obligations, due or not due, liquidated, contingent or unliquidated

or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Facility Maturity Date.  Except as otherwise expressly provided in this Agreement and the other Loan Documents, all undertakings, agreements, covenants, warranties and representations of or binding upon the Debtors, and all rights of DIP Agent and the Lenders, all as contained in the Loan Documents, shall not terminate or expire, but rather shall survive any such termination or cancellation and shall continue in full force and effect until the Facility Maturity Date; provided, however, that in all events the provisions of Section 2.8, Section 2.9, Section 2.10, any other indemnities and reimbursement obligations contained in this Agreement and the other Loan Documents, and, with respect to each of the foregoing, the provisions of ARTICLE XII, shall survive the Facility Maturity Date.

# ARTICLE VIII

## EVENTS OF DEFAULT; RIGHTS AND REMEDIES

**Section 8.1    Events of Default.**

The occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an event of default (each such event, an "**Event of Default**") hereunder:

(a)    Borrower fails to pay when due and payable, or when declared due and payable, (i) all or any portion of the Obligations consisting of interest, fees, or charges due the Lender Group, reimbursement of expenses owing hereunder or under the other Loan Documents, or other amounts (other than any portion thereof constituting principal) constituting Obligations (including any portion thereof that accrues after the commencement of an Insolvency Proceeding) and such failure shall continue for a period of three (3) Business Days, or (ii) all or any portion of the principal of the Obligations;

(b)    Any Debtor fails or neglects to perform, keep or observe any of the covenants, provisions or other agreements of (i) Sections 5.1(a), 5.1(c), 5.1(d), 5.1(e), 5.2, 5.6(i), 5.7, 5.10 or ARTICLE VI, respectively, that each Debtor is obligated by such sections or articles to perform, keep or observe; or (ii) Sections 5.1(b), 5.1(f), 5.1(g), 5.1(h), 5.1(j), 5.3, 5.4, 5.5, 5.8, 5.9 and 5.11, respectively, that each Debtor is obligated by such sections to perform, keep or observe and the same shall continue unremedied for a period of ten (10) days after the date on which such event shall have occurred;

(c)    Any Debtor fails or neglects to perform, keep or observe any other covenants, provisions or other agreements of this Agreement or any of the other Loan Documents (other than any provision embodied in or covered by any other clause of this Section 8.1) which such Debtor is obligated to perform, keep or observe, and the same shall continue unremedied for a period of thirty (30) days after the earlier of (i) the date on which such event shall first become known to any officer of any such Person or (ii) written notice thereof is given to Borrower by DIP Agent or any Lender;

(d)     Any warranty, representation, or statement, made herein or in any other Loan Document or delivered to DIP Agent or any Lender by or on behalf of any Debtor in connection with this Agreement or any other Loan Document proves to be untrue in any material respect as of the date of issuance or making or deemed making thereof;

(e)     Except for any defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from the Obligations with respect to which the Bankruptcy Code prohibits any Debtor from complying or permits any Debtor not to comply, any Debtor shall default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness in an aggregate principal amount in excess of $750,000 for money borrowed by Borrower or any of its Subsidiaries (or the payment of which is Guaranteed by Borrower, a Guarantor or any of their respective Subsidiaries) entered into (i) pre-petition which is affirmed after the Petition Date or (ii) post-petition, and, in each case, such default (A) is caused by a failure to pay principal of, or interest or premium, if any, on, such Indebtedness prior to the expiration of the grace period provided in such Indebtedness on the date of such default; or (B) results in the acceleration of, or permits the holder or holders of such Indebtedness to cause, with the giving of notice, if required, to cause the acceleration of, such Indebtedness prior to its express maturity;

(f)     If any material portion of the assets of any Debtor is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any receiver, trustee, custodian or assignee for the benefit of creditors and such condition is not discharged or stayed before the earlier of thirty (30) days after the date it first arises or five (5) days prior to the date on which such property or asset is subject to forfeiture by such Debtor;

(g)     If any Debtor is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of such Debtor;

(h)     One or more judgments or decrees shall be entered after the Petition Date against any Debtor involving in the aggregate a liability of $500,000 or more and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof;

(i)     Except as permitted by this Agreement or by the terms of any Loan Document,

(i)     any Loan Document ceases for any reason to be fully enforceable, or any Debtor which is party to any Loan Documents so asserts;

(ii)     any Lien on the Collateral purported to be granted to DIP Agent and Lenders under any Loan Document or the Final Order ceases for any reason to be valid and enforceable and of the same effect and priority purported to be created thereby; or

(iii)     any Debtor or any Person acting on behalf of any of them, denies or disaffirms, in writing, any obligation of Borrower or any Guarantor set forth in or arising under any Loan Document;

*DIP Credit Agreement*

548336.10/2576-00015

(j)     Except as permitted by this Agreement, this Agreement or any other Loan Document is held in any judicial proceeding to be unenforceable or invalid or ceases for any reason to be in full force and effect, or any Guarantor, or any Person acting on behalf of any Guarantor, denies or disaffirms its obligations under its Guarantee;

(k)     Any ERISA Event shall occur that could reasonably be expected to have a Material Adverse Effect; or

(l)     The occurrence of any of the following in any of the Chapter 11 Cases:

(i)     the entry of an order regarding the dismissal of any of the Chapter 11 Cases, or the conversion of any of the Chapter 11 Cases from one under chapter 11 to one under Chapter 7 of the Bankruptcy Code,

(ii)     the entry of an order by the Bankruptcy Court appointing an interim or permanent trustee in any of the Chapter 11 Cases or appointing a receiver or an examiner in any of the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business or reorganization of any of the Debtors (powers beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(iii)     the entry of an order of competent jurisdiction granting relief from or modifying the automatic stay applicable under Section 362 of the Bankruptcy Code to permit one or more creditors to execute upon, enforce or foreclose on any Collateral;

(iv)     (A) the entry of an order of competent jurisdiction (1) reversing, staying, vacating or rescinding the Final Order, or the Final Order otherwise ceases to be in full force and effect or (2) amending, supplementing or otherwise modifying the Final Order, in each case, without the prior written consent of all of the Lenders; or (B) the filing of a motion for reconsideration in respect of the Revolving Loans and Revolving Loan Commitments, without DIP Agent's and the Lenders' consent;

(v)     (A) the entry of an order in any of the Chapter 11 Cases confirming a Reorganization Plan or plan of liquidation that does not contain a provision for the payment in full in cash of the Obligations on or before the effective date of such Reorganization Plan or plan of liquidation; (B) entry of an order which dismisses any of the Chapter 11 Cases and which order does not provide for payment in full in cash of the Obligations; or (C) any of the Debtors seek, support or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order;

(vi)     an application for any of the orders described in clauses (ii) through (v) above shall be made by a Debtor;

(vii)     an application for any of the orders described in clauses (ii) through (v) above shall be made by a Person other than the Debtors and such application is not contested by the Debtors in good faith and the relief requested is granted in an order that is not stayed pending appeal;

*DIP Credit Agreement*

(viii)   the payment of, or application for authority to pay, any post-petition judgments without the prior written consent of the Required Lenders, unless provided for in the applicable Budget or the Plan Support Agreement or otherwise permitted under this Agreement;

(ix)   the payment of, or application for authority to pay, any pre-petition claim without the prior written consent of Required Lenders, unless provided for in the applicable Budget or the Plan Support Agreement or otherwise permitted under this Agreement;

(x)   the submission by the Debtors of any motion or other pleading attacking the validity or enforceability of the Loan Documents or any other documents executed in connection with this Agreement or the Final Order;

(xi)   any Debtor shall attempt to invalidate, reduce or otherwise impair (A) the Liens or security interests of DIP Agent and Lenders or (B) the claims or rights of DIP Agent and Lenders against Debtors;

(xii)   any default under any cash collateral order shall occur that shall result in a termination of the right to use cash collateral thereunder;

(xiii)   the entry of an order of competent jurisdiction in any of the Chapter 11 Cases substantively consolidating the Debtors;

(xiv)   the entry of an order of competent jurisdiction in any of the Chapter 11 Cases granting any other super priority administrative expense claim or Lien on any Collateral which Lien is *pari passu* or senior to that granted to DIP Agent, on behalf of itself and the Lenders (except provided in <u>Section 2.14</u> and as set forth in the Final Order);

(xv)   the making of total cumulative disbursements on the line items described in this <u>subsection 8.1(l)(xv)</u> in excess of 15% of the weekly cumulative budgeted amount listed in the Initial Budget and each Subsequent Budget delivered thereafter, for the relevant week, measured on an individual basis compared to the applicable Budget; for purposes of this <u>subsection 8.1(l)(xv)</u>, the following Budget line items shall apply:   Total Operating Disbursements; Total Corporate Disbursements; Capex Disbursements; and Total Professional Fees;

(xvi)   the receipt by the Debtors of total receipts in an aggregate amount of less than 75% of the budgeted amount of the Total Receipts line item listed in the Initial Budget and each Subsequent Budget delivered thereafter, as measured on a weekly basis (commencing November 27, 2009) upon delivery of the applicable Weekly Report for the rolling four-week period ending on such measurement date;

(xvii)   (A) the entry of any motion or other pleading by any Debtor seeking an extension of such Debtor's exclusive period to file a Reorganization Plan, (B) any party other than Borrower or DIP Agent files a Reorganization Plan or (C) Borrowers exclusive right to file a Reorganization Plan expires or is terminated, in each case without the prior written consent of DIP Agent and the Lenders;

*DIP Credit Agreement*

(xviii)  the filing of a motion, pleading or proceeding by any Debtor that could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party that results in a material impairment;

(xix)  any Debtor shall file a motion or other pleading seeking the dismissal of any of the Chapter 11 Cases under § 1112 of the Bankruptcy Code or otherwise; or

(xx)  (A) any Debtor shall assert any claims against the Lenders pursuant to § 506(c) of the Bankruptcy Code or any other action is commenced by any Debtor that is adverse to the Lenders or the Lenders' respective rights and remedies under this Agreement or any Bankruptcy Court order, or (B) any person shall prevail in the assertion of any claim against the Lenders pursuant to § 506(c) of the Bankruptcy Code.

Upon becoming aware of any Default or Event of Default, Borrower is required to deliver to DIP Agent a statement specifying such Default or Event of Default.

**Section 8.2    Remedies.**

Upon the occurrence, and during the continuation, of an Event of Default, the Required Lenders (at their election but without notice of their election and without demand, except as otherwise specified in this <u>Section 8.2</u>) may authorize and instruct DIP Agent to do any one or more of the following on behalf of the Lender Group (and DIP Agent, acting upon the instructions of the Required Lenders, shall do the same on behalf of the Lender Group), all of which are authorized by the Debtors:

(a)  Declare all or any portion of the Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable, without presentment, demand, protest, or notice of any kind, all of which are expressly waived by Borrower;

(b)  Cease advancing money or extending credit to or for the benefit of Borrower under this Agreement, under any of the Loan Documents, or under any other agreement between Borrower and the Lender Group;

(c)  Terminate this Agreement and any of the other Loan Documents as to any future liability or obligation of the Lender Group (including terminating the Revolving Loan Commitments), but without affecting any of DIP Agent's and Lenders' Liens in the Collateral and without affecting the Obligations;

(d)  Set-off amounts in any account maintained with DIP Agent or otherwise enforce rights against any other Collateral in the possession of DIP Agent or any Lender and apply such amounts to the obligations of the Debtors hereunder and in the other Loan Documents; and

(e)  The Lender Group shall have all other rights and remedies available at law or in equity or pursuant to any other Loan Document;

*DIP Credit Agreement*

<u>provided</u> that with respect to clause (d) above and the enforcement of Liens or other remedies with respect to clause (e) above, DIP Agent shall provide the Debtors (or their counsel), the Committee in the Chapter 11 Cases (or its counsel) and the United States Trustee for the Southern District of Texas, Houston Division, with five (5) days' prior written notice prior to taking the action contemplated thereby.

**Section 8.3      Waivers By Borrower.**

Except as otherwise expressly provided for in this Agreement, any other Loan Document or by applicable law, each Debtor irrevocably waives (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by DIP Agent or any Lender on which such Debtor may in any way be liable, and hereby ratifies and confirms whatever DIP Agent may do in this regard, (b) all rights to notice and a hearing prior to DIP Agent's taking possession or control of, or to DIP Agent's replevy, attachment or levy upon, the Collateral or any bond or security which might be required by any court prior to allowing DIP Agent to exercise any of its remedies, (c) the benefit of all valuation, appraisal, marshaling and exemption laws and (d) any right to seek relief under the Bankruptcy Code, including, without limitation, under § 105, to the extent such relief would restrict or impair the rights and remedies of DIP Agent or the Lenders set forth in the Final Order, this Agreement or any other Loan Document; <u>provided</u> that in the event that any party requests a hearing seeking to prevent DIP Agent or the Lenders from exercising any of their rights and remedies that arise after an Event of Default, the sole issue before the Bankruptcy Court at such hearing shall be whether an Event of Default has occurred and has not been cured, and no other issue or argument shall be relevant to any opposition to the enforcement of DIP Agent's and Lenders' rights.  Subject solely to the requirement of the giving of five (5) day's prior written notice, the automatic stay provided in Section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court and DIP Agent and the Lenders shall be entitled to exercise all of their respective rights and remedies with respect to the Collateral.

**ARTICLE IX**

**ASSIGNMENTS AND PARTICIPATIONS**

**Section 9.1      Lender Assignments and Participations.**

(a)      <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Debtor may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of DIP Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of <u>Section 9.1(b)</u>, (ii) by way of participation in accordance with the provisions of <u>Section 9.1(d)</u>, (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 9.1(f)</u>, or (iv) to an SPC in accordance with

the provisions of Section 9.1(h) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in paragraph (d) of this Section 9.1 and, to the extent expressly contemplated hereby, the Related Parties of the DIP Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Assignments by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Commitment(s), and the Revolving Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)     Minimum Amounts.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Revolving Commitment and the Revolving Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or a Related Fund, no minimum amount need be assigned; and

(B)     in any case not described in Section 9.1(b)(i)(A), the aggregate amount of the Revolving Commitment (which for this purpose includes Revolving Loans outstanding thereunder) subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to DIP Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $500,000 and additional increments of $100,000 in excess of such minimum amount, unless each of DIP Agent and, so long as no Event of Default has occurred and is continuing, Borrower otherwise consent (each such consent not to be unreasonably withheld or delayed).

(ii)     Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Revolving Loans or the Revolving Commitment assigned;

(iii)     Required Consents.  No consent shall be required for any assignment except to the extent required by Section 9.1(b)(i)(B) and, in addition, the consent of Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (A) an Event of Default has occurred and is continuing at the time of such assignment or (B) such assignment is to a Lender, an Affiliate of a Lender or a Related Fund.

(iv)     Assignment and Assumption.  The parties to each assignment shall execute and deliver to the DIP Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; provided, however, that DIP Agent may, in its sole discretion, waive such processing and recordation fee in the case of an assignment.  The assignee, if it is not a Lender, shall deliver to DIP Agent an Administrative Questionnaire;

(v) <u>No Assignment to Borrower</u>.  No such assignment shall be made to Borrower or any of Borrower's Affiliates or Subsidiaries; and

(vi) <u>No Assignment to Natural Persons</u>.  No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by DIP Agent pursuant to <u>Section 9.1(c)</u> from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of the Obligations which expressly survive this Agreement and the other Loan Documents pursuant to the terms hereof and thereof, with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>Section 9.1(d)</u>.

(c) <u>Register</u>.  DIP Agent, acting solely for this purpose as an agent of Borrower, shall maintain at its office in Dallas, Texas, a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Revolving Commitments of, and principal amounts of the Revolving Loans owing to, each Lender pursuant to the terms hereof from time to time (the **"Register"**).  The entries in the Register shall be conclusive, and Borrower, DIP Agent and Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  Any assignment of any Revolving Loan, whether or not evidenced by a Note, shall be effective only upon appropriate entries with respect thereto being made in the Register (and each Note shall expressly so provide).  The Register shall be available for inspection by Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d) <u>Participations</u>.  Any Lender may at any time, without the consent of, or notice to, Borrower or DIP Agent, sell participations to any Person (other than a natural person or Borrower or any of Borrower's Affiliates or Subsidiaries) (each, a **"Participant"**) in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Revolving Commitment and/or the Revolving Loans owing to it); <u>provided</u> that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) Borrower, DIP Agent and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document;

*DIP Credit Agreement*

provided, that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver which (A) extends the final maturity date of the Obligations hereunder in which such Participant is participating, (B) reduces the interest rate applicable to the Obligations hereunder in which such Participant is participating, (C) releases all or substantially all of the Collateral or guaranties (except to the extent expressly provided herein or in any of the Loan Documents) supporting the Obligations hereunder in which such Participant is participating, (D) postpone the payment of, or reduce the amount of, the interest or fees payable to such Participant through such Lender, or (E) changes the amount or due dates of scheduled principal repayments or prepayments or premiums described.  Subject to Section 9.1(e), Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.9 and 2.10 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 9.1(b).

(e)     Limitations Upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Sections 9.1, 2.9 and 2.10 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with Borrower's prior written consent or the greater payment pursuant to Section 2.9 is the result of a change in law occurring after the date the participation has been sold.  A Participant that would be a foreign Lender if it were a Lender shall not be entitled to the benefits of Section 9.1 unless Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of Borrower, to comply with Section 9.1(e) as though it were a Lender.

(f)     Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)     Special Purpose Funding Vehicles.  Notwithstanding anything to the contrary contained herein, any Lender (a **"Granting Lender"**) may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to DIP Agent and Borrower (an **"SPC"**) the option to provide all or any part of any Revolving Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided, that (i) nothing herein shall constitute a commitment by any SPC to fund any Revolving Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Revolving Loan, the Granting Lender shall be obligated to make such

*DIP Credit Agreement*

548336.10/2576-00015

Revolving Loan pursuant to the terms hereof or, if it fails to do so, to make such payment to DIP Agent as is required by Section 2.1(c). Each party hereto hereby agrees that (i) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, (ii) no SPC shall be entitled to the benefits of Sections 9.1, 2.9 and 2.10 (or any other increased costs protection provision) and (iii) the Granting Lender shall for all purposes, including, without limitation, the approval of any amendment or waiver of any provision of any Loan Document, remain the Lender of record hereunder. The making of a Revolving Loan by an SPC hereunder shall constitute utilization of the Revolving Commitment of the Granting Lender to the same extent, and as if, such Revolving Loan was made by such Granting Lender. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior Indebtedness of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the laws of the United States or any State thereof. Notwithstanding anything to the contrary contained in this Agreement, any SPC may (i) with notice to, but without prior consent of, Borrower and DIP Agent and without payment of a processing fee therefor, assign all or any portion of its interest in any Revolving Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Revolving Loans to any rating agency, commercial paper dealer or provider of any surety or guarantee or credit or liquidity enhancement to such SPC. This subsection (h) may not be amended without the prior written consent of each Granting Lender, all or any part of whose Revolving Loans are being funded by the SPC at the time of such amendment.

(i)      Notes.  Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in subsection (b) above.

## ARTICLE X

## AGENTS; THE LENDER GROUP

**Section 10.1   Appointment and Authorization of DIP Agent.**

Each Lender hereby designates and appoints ORIX as its representative under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes DIP Agent to execute and deliver each of the other Loan Documents on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to DIP Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. DIP Agent agrees to act as such on the express conditions contained in this ARTICLE XI. The provisions of this ARTICLE XI are solely for the benefit of DIP Agent, and the Lenders, and Borrower, Guarantor and their respective Subsidiaries shall have no rights as a third party beneficiary of any of the provisions contained herein. Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, DIP Agent shall not have any duties or responsibilities, except those expressly

set forth herein, nor shall DIP Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against DIP Agent; it being expressly understood and agreed that the use of the term "DIP Agent" is for convenience only, that ORIX is merely the representative of the Lenders, and only has the contractual duties set forth herein.  Except as expressly otherwise provided in this Agreement, DIP Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that DIP Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents.  Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to DIP Agent, Lenders agree that DIP Agent shall have the right to exercise, for the benefit of the Lender Group, the following powers as long as this Agreement remains in effect:  (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, the Collections of Borrower and the other Debtors, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, (c) make Revolving Loans, for itself or on behalf of Lenders as provided in the Loan Documents, (d) exclusively receive, apply, and distribute the Collections of Borrower and the other Debtors as provided in the Loan Documents, (e) open and maintain such bank accounts and cash management arrangements as DIP Agent deems necessary and appropriate in accordance with the Loan Documents for the foregoing purposes with respect to the Collateral and the Collections of Borrower and the other Debtors, (f) perform, exercise, and enforce any and all other rights and remedies of the Lender Group with respect to any Debtor, the Obligations, the Collateral, the Collections of Borrower and the other Debtors, or otherwise related to any of same as provided in the Loan Documents, and (g) incur and pay such Lender Group Expenses as DIP Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

## Section 10.2    Delegation of Duties.

DIP Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  DIP Agent shall not be responsible for the negligence or misconduct of any agent or attorney in fact that it selects as long as such selection was made without gross negligence or willful misconduct.

## Section 10.3    Liability of Agent-Related Persons.

None of the Agent-Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders for any recital, statement, representation or warranty made by any Debtor or any Subsidiary or Affiliate of any Debtor, or any officer, director, agent or representative thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to

*DIP Credit Agreement*

or provided for in, or received by DIP Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of any Debtor or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the books and records or properties of any Debtor or the books or records or properties of any Debtor's Subsidiaries or Affiliates.

**Section 10.4   Reliance by DIP Agent.**

Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, telefacsimile or other electronic method of transmission, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to Borrower or any other Debtor or counsel to any Lender), independent accountants and other experts selected by DIP Agent. Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless DIP Agent shall first receive such advice or concurrence of the Lenders as it deems appropriate and until such instructions are received, DIP Agent shall act, or refrain from acting, as it deems advisable. If DIP Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. DIP Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the requisite Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders.

**Section 10.5   Notice of Default or Event of Default.**

No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to DIP Agent for the account of the Lenders and, except with respect to Events of Default of which DIP Agent has actual knowledge, unless DIP Agent shall have received written notice from a Lender or an Debtor referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default." DIP Agent promptly will notify the Lenders of its receipt of any such notice or of any Event of Default of which DIP Agent has actual knowledge. If any Lender obtains actual knowledge of any Event of Default, such Lender promptly shall notify the other Lenders and DIP Agent of such Event of Default. Each Lender shall be solely responsible for giving any notices to its Participants, if any. Subject to Section 10.4, DIP Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Lenders in accordance with Section 9.2; provided, however, that unless and until DIP Agent has received any such request, DIP Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

66

*DIP Credit Agreement*

**Section 10.6    Credit Decision.**

Each Lender acknowledges that none of the Agent-Related Persons has made any representation or warranty to it, and that no act by DIP Agent hereinafter taken, including any review of the affairs of any Debtor and its Subsidiaries or Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender.  Each Lender represents to DIP Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of Borrower and any other Person party to a Loan Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to Borrower.  Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of Borrower and any other Person party to a Loan Document.  Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by DIP Agent, DIP Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of Borrower and any other Person party to a Loan Document that may come into the possession of any of the Agent-Related Persons.

**Section 10.7    Costs and Expenses; Indemnification.**

DIP Agent may incur and pay Lender Group Expenses to the extent DIP Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, attorneys fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not Borrower or any other Debtor is obligated to reimburse DIP Agent or Lenders for such expenses pursuant to this Agreement or otherwise.  DIP Agent is authorized and directed to deduct and retain sufficient amounts from the Collections of Borrower or any other Debtor received by DIP Agent to reimburse DIP Agent for such out-of-pocket costs and expenses and any amounts owing to DIP Agent pursuant to the Fee Letter prior to the distribution of any amounts to Lenders.  In the event DIP Agent is not reimbursed for such costs and expenses and any amounts owing to DIP Agent pursuant to the Fee Letter from the Collections of Borrower or any other Debtor received by DIP Agent, each Lender hereby agrees that it is and shall be obligated to pay to or reimburse DIP Agent for the amount of such Lender's *Pro Rata* Share thereof.  Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Agent-Related Persons (to the extent not reimbursed by or on behalf of Borrower or any other Debtor and without limiting the obligation of Borrower or any other Debtor to do so), according to their *Pro Rata* Shares, from and against any and all Indemnified Liabilities;

*DIP Credit Agreement*

provided, however, that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct nor shall any Lender be liable for the obligations of any Defaulting Lender in failing to make a Revolving Loan or other extension of credit hereunder. Without limitation of the foregoing, each Lender shall reimburse DIP Agent upon demand for such Lender's *Pro Rata* Share of any costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by DIP Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that DIP Agent is not reimbursed for such expenses by or on behalf of Borrower or any other Debtor.  The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of DIP Agent.

**Section 10.8   DIP Agent in Individual Capacity.**

ORIX and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in, and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with Borrower, Guarantor and their respective Subsidiaries and Affiliates and any other Person party to any Loan Documents as though ORIX were not DIP Agent hereunder, and, in each case, without notice to or consent of the other members of the Lender Group.  The other members of the Lender Group acknowledge that, pursuant to such activities, ORIX or its Affiliates may receive information regarding Borrower, Guarantor or their respective Affiliates and any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of Borrower or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver DIP Agent will use its commercially reasonable efforts to obtain), DIP Agent shall not be under any obligation to provide such information to them.  The terms "Lender" and "Lenders" include ORIX in its individual capacity.

**Section 10.9   Successor DIP Agent.**

DIP Agent may resign as DIP Agent upon thirty (30) days notice to the Lenders. If DIP Agent resigns under this Agreement, the Required Lenders shall appoint a successor DIP Agent for the Lenders.  If no successor DIP Agent is appointed prior to the effective date of the resignation of DIP Agent, DIP Agent may appoint, after consulting with the Lenders, a successor DIP Agent.  Upon the acceptance of its appointment as successor DIP Agent hereunder, such successor DIP Agent shall succeed to all the rights, powers, and duties of the retiring DIP Agent and the term "DIP Agent" shall mean such successor DIP Agent and the retiring DIP Agent's appointment, powers, and duties as DIP Agent shall be terminated.   After any retiring DIP Agent's resignation hereunder as DIP Agent, the provisions of this ARTICLE X shall inure to its benefit as to any actions taken or omitted to be taken by it while it was DIP Agent under this Agreement.  If no successor DIP Agent has accepted appointment as DIP Agent by the date which is thirty (30) days following a retiring DIP Agent's notice of resignation, the retiring DIP

*DIP Credit Agreement*

Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of DIP Agent hereunder until such time, if any, as the Lenders appoint a successor DIP Agent as provided for above.

**Section 10.10  Lender in Individual Capacity.**

Any Lender and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with Borrower, Guarantor and their respective Subsidiaries and Affiliates and any other Person party to any Loan Documents as though such Lender were not a Lender hereunder without notice to or consent of the other members of the Lender Group.  The other members of the Lender Group acknowledge that, pursuant to such activities, such Lender and its respective Affiliates may receive information regarding Borrower, Guarantor or their respective Affiliates and any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of Borrower, Guarantor or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver such Lender will use its commercially reasonable efforts to obtain), such Lender shall not be under any obligation to provide such information to them.

**Section 10.11  Collateral Matters.**

(a)      The Lenders hereby irrevocably authorize DIP Agent, at its option and in its sole discretion, to release any Lien on any Collateral (i) upon the termination of the Revolving Loan Commitments and payment and satisfaction in full by Borrower of all Obligations, (ii) constituting property being sold or disposed of if a release is required or desirable in connection therewith and if Borrower certifies to DIP Agent that the sale or disposition is permitted under Section 6.2 of this Agreement or the other Loan Documents (and DIP Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which none of Borrower or any other Debtor owned any interest at the time DIP Agent's Lien was granted nor at any time thereafter, or (iv) constituting property leased to a Borrower or its Subsidiaries under a lease that has expired or is terminated in a transaction permitted under this Agreement.  Except as provided above, DIP Agent will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of (A) if the release is of all or substantially all of the Collateral, all of the Lenders, or (B) otherwise, the Required Lenders. Upon request by DIP Agent or Borrower at any time, the Lenders will confirm in writing DIP Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this Section 10.11; provided, however, that (1) no Agent shall be required to execute any document necessary to evidence such release on terms that, in DIP Agent's opinion, would expose DIP Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of Borrower or any other Debtor in respect of) all interests retained by Borrower or any other Debtor as applicable, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

*DIP Credit Agreement*

(b)     DIP Agent shall not have any obligation whatsoever to any of the Lenders to assure that the Collateral exists or is owned by Borrower or any other Debtor or is cared for, protected, or insured or has been encumbered, or that DIP Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to DIP Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, DIP Agent may act in any manner it may deem appropriate, in its sole discretion given DIP Agent's own interest in the Collateral in its capacity as DIP Agent and that DIP Agent shall have no other duty or liability whatsoever to any Lender as to any of the foregoing, except as otherwise provided herein.

**Section 10.12  Restrictions on Actions by Lenders; Sharing of Payments.**

(a)     Each of the Lenders agrees that it shall not, without the express written consent of DIP Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of DIP Agent, set off against the Obligations, any amounts owing by such Lender to Borrower or any other Debtor or any deposit accounts of Borrower or any other Debtor now or hereafter maintained with such Lender.  Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by DIP Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings, to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)     If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from DIP Agent pursuant to the terms of this Agreement, or (ii) payments from DIP Agent in excess of such Lender's ratable portion of all such distributions by DIP Agent, such Lender promptly shall (1) turn the same over to DIP Agent, in kind, and with such endorsements as may be required to negotiate the same to DIP Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (2) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their *Pro Rata* Shares; provided, however, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

**Section 10.13  Payments by DIP Agent to the Lenders.**

All payments to be made by any DIP Agent to the Lenders shall be made by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as each

*DIP Credit Agreement*

party may designate for itself by written notice to such DIP Agent.  Concurrently with each such payment, DIP Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the Obligations.

## Section 10.14  Concerning the Collateral and Related Loan Documents.

Each member of the Lender Group authorizes and directs DIP Agent to enter into this Agreement and the other Loan Documents to which it is a party.  Each member of the Lender Group agrees that any action taken by each of DIP Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by DIP Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

## Section 10.15  Several Obligations; No Liability.

Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of DIP Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of DIP Agent (if any) to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective Revolving Loan Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective Revolving Loan Commitments.  Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender.  Each Lender shall be solely responsible for notifying its Participants of any matters relating to the Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender.  Except as provided in Section 11.10, no member of the Lender Group shall have any liability for the acts of any other member of the Lender Group.  No Lender shall be responsible to any Borrower or any other Person for any failure by any other Lender to fulfill its obligations to make credit available hereunder, nor to advance for it or on its behalf in connection with its Revolving Loan Commitment, nor to take any other action on its behalf hereunder or in connection with the financing contemplated herein.

## Section 10.16  Collateral.

Simultaneously with the execution of this Agreement, DIP Agent is hereby duly constituted and appointed as DIP Agent to hold the Liens and security interests in and to the Collateral granted by the Loan Documents on behalf of the Lender Group.  Upon the written direction of the Required Lenders pursuant to the Loan Documents, DIP Agent shall enter into any other Additional Documents that the Required Lenders reasonably deem, or DIP Agent reasonably deems, necessary or advisable to carry out the purposes of this Agreement and the other Loan Documents.

## Section 10.17  After-Acquired Collateral.

In the event that Borrower or any other Debtor obtains any After-Acquired Collateral, DIP Agent shall, upon the presentation of the appropriate Security Document(s) or

other documentation to DIP Agent by Borrower or such other Debtor, enter into such Security Document(s) or other documentation, as reasonably requested by the Required Lenders in writing, as applicable pursuant to the Loan Documents, to take a valid security interest in, or pledge of, all such After-Acquired Collateral in favor of DIP Agent pursuant to the Loan Documents for the benefit of the Lender Group, and DIP Agent shall cooperate with Borrower, the other Debtors, the Required Lenders and DIP Agent to accomplish the purposes of this paragraph.

## Section 10.18  Authorization of Other Actions to be Taken by DIP Agent Under the Security Documents

DIP Agent shall, upon receipt of written instructions from the Required Lenders (on their behalf), as applicable pursuant to the Loan Documents, take all actions as instructed in respect of the institution of sale or foreclosure proceedings, in order to (a) exercise any of the rights and remedies under, and enforce any of the terms of, the Security Documents, and (b) collect and receive any and all amounts payable in respect of the Obligations.  DIP Agent shall have the power to institute and to maintain such suits and proceedings in its own name as DIP Agent or in the names of the Lenders or the other members of the Lender Group as the Required Lenders may instruct to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of the Loan Documents or this Agreement, and such suits and proceedings in its own name as DIP Agent or in the names of the Lenders or the other members of the Lender Group as the Required Lenders may instruct to preserve or protect the interests of the Lender Group in the Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of the Lender Group).

## Section 10.19  Successor Agent by Merger, Etc.

Any Person into which DIP Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which DIP Agent shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the and the investment advisory business of DIP Agent, shall be the successor of DIP Agent hereunder without the execution or filing of any paper or any further act on the part of any of the parties hereto.

## Section 10.20  Delivery of Documents, Notices, Etc.

In addition to, and in furtherance of any requirement placed upon DIP Agent herein to deliver, provide, distribute, notify or otherwise convey items received from Borrower to the Lenders, DIP Agent shall promptly notify the Lenders of any notices, documents, requests, demands or other items DIP Agent received from Borrower and promptly delivery or convey, to the extent they are in written form, such notices, documents, requests, demands or items to the Lenders.

*DIP Credit Agreement*

# ARTICLE XI

## MISCELLANEOUS

**Section 11.1   Complete Agreement; Modification of Agreement.**

The Loan Documents (a) constitute the complete agreement among the parties with respect to the subject matter thereof (except as may be set forth in the Fee Letter), (b) shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof (except as may be set forth in the Fee Letter), and (c) may not be modified, altered or amended except as set forth in <u>Section 11.2</u>.  Any letter of interest, proposal letter, commitment letter, confidentiality agreement or fee letter (other than the Fee Letter) between or among any Debtor, DIP Agent, any Lender or any of their respective Affiliates, predating this Agreement and relating to this financing shall be superseded by this Agreement.

**Section 11.2   Amendments and Waivers.**

(a)      Except for actions expressly permitted to be taken by DIP Agent, no amendment, modification, termination or waiver of any provision of this Agreement or any other Loan Document, or any consent to any departure by Borrower, Guarantor or any other Debtor therefrom, shall in any event be effective unless the same shall be in writing and signed by Borrower, Guarantor or such other Debtor as applicable, DIP Agent and each of the Required Lenders (or by DIP Agent at the written request of the Required Lenders).  Except as set forth in <u>Section 11.2(b)</u> below, all such amendments, modifications, terminations or waivers requiring the consent of any Lenders shall require the written consent of the Required Lenders.

(b)      No amendment, modification, termination or waiver shall, unless in writing and signed by all of the Lenders adversely affected thereby and Borrower, do any of the following:

(i)      increase or extend the Revolving Loan Commitment or Revolving Loan of any Lender or increase the aggregate Revolving Loan Commitments;

(ii)      postpone or delay any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees, or other amounts due hereunder or under any other Loan Document;

(iii)      reduce the principal of, or the rate of interest on, any loan or other extension of credit hereunder, or reduce any fees or other amounts payable hereunder or under any other Loan Document;

(iv)      change the *Pro Rata* Share that is required to take any action hereunder;

(v)      amend, waive or modify <u>Sections 2.3(c)</u>, <u>2.7</u> or <u>2.13</u>;

(vi)     amend, waive or modify this <u>Section 11.2</u> or any provision of this Agreement providing for consent or other action by all Lenders;

(vii)     other than as permitted by <u>Section 10.11</u>, release DIP Agent's Lien in and to any of the Collateral;

(viii)     change the definition of "Required Lenders" or "*Pro Rata* Share";

(ix)     contractually subordinate any of DIP Agent's Liens; or

(x)     other than in connection with a merger, liquidation, dissolution or sale of such Person expressly permitted by the terms hereof, release Borrower or any other Debtor from any obligation for the payment of money.

(c)     Furthermore, no amendment, modification, termination or waiver affecting the rights or duties of DIP Agent under this Agreement or any other Loan Document (including, without limitation, any amendment to the provisions of <u>Section 10</u>) shall be effective unless in writing and signed by DIP Agent, in addition to the Lenders required hereinabove to take such action.   The foregoing notwithstanding, any amendment, modification, waiver, consent, termination, or release of, or with respect to, any provision of this Agreement or any other Loan Document that relates only to the relationship of the Lender Group among themselves, and that does not affect the rights or obligations of Borrower or any other Debtor, shall not require consent by or the agreement of Borrower or any other Debtor.

(d)     Each amendment, modification, termination or waiver shall be effective only in the specific instance and for the specific purpose for which it was given.   No amendment, modification, termination or waiver shall be required for DIP Agent to take additional Collateral pursuant to any Loan Document or to release any Collateral in accordance with the terms of, and as expressly permitted by, the Loan Documents.   No notice to or demand on Borrower or any other Debtor in any case shall entitle Borrower or any other Debtor to any other or further notice or demand in similar or other circumstances.   Any amendment, modification, termination, waiver or consent effected in accordance with this <u>Section 11.2</u> shall be binding upon each of the parties hereto.

**Section 11.3   Successors and Assigns.**

This Agreement and the other Loan Documents shall be binding on and shall inure to the benefit of each Debtor, each DIP Agent and each Lender and their respective successors and assigns (including, in the case of a Debtor, a debtor-in-possession on behalf of such Debtor), except as otherwise provided herein or therein.   Neither Borrower nor any other Debtor may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of DIP Agent and the Lenders.   Any such purported assignment, transfer, hypothecation or other conveyance by such Debtor without the prior express written consent of DIP Agent and the Lenders shall be null and void *ab initio*. A Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder pursuant to <u>Section 9.1</u> hereof and, except as expressly required pursuant to <u>Section 9.1</u> hereof, no consent or approval

*DIP Credit Agreement*

by any Borrower is required in connection with any such assignment.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the parties hereto with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any kind of any of the terms and provisions of this Agreement or any of the other Loan Documents.

**Section 11.4    Taxes and Expenses.**

      If Borrower fails to pay any monies (whether taxes, assessments, insurance premiums, or, in the case of leased properties or assets, rents or other amounts payable under such leases) due to third Persons, or fails to make any deposits or furnish any required proof of payment or deposit, all as required under the terms of this Agreement, then, DIP Agent, in its sole discretion and without prior notice to Borrower, may do any or all of the following:  (a) make payment of the same or any part thereof or (b) in the case of the failure to comply with Section 5.10 hereof, obtain and maintain insurance policies of the type described in Section 5.10 and take any action with respect to such policies as DIP Agent deems prudent.  Any such amounts paid by DIP Agent shall constitute Obligations and any such payments shall not constitute an agreement by the Lender Group to make similar payments in the future or a waiver by the Lender Group of any Event of Default under this Agreement.  DIP Agent need not inquire as to, or contest the validity of, any such expense, tax, or Lien and the receipt of the usual official notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.

**Section 11.5    Fees and Expenses.**

      (a)    Borrower shall reimburse DIP Agent and the Lenders for all reasonable internal and external audit, legal, appraisal, syndication, computer, travel, messenger, courier, insurance, evaluation, filing, document duplication and reproduction, administrative and investigation (including, without limitation, expenses in connection with responses to and preparations for any subpoena or request for document production with which any Lender is served or deposition or other proceeding in which any Lender is called to testify that relates in any way to the Obligations, the Collateral, any Debtor, this Agreement or any of the other Loan Documents) expenses reasonably incurred and for all other out-of-pocket costs and the reasonable fees, expenses and disbursements of DIP Agent's and Lenders' counsel, local counsel, auditors, accountants, appraisers, printers, insurance and environmental advisers, and other consultants and agents (all such costs and expenses, "**Lender Group Expenses**"), and shall provide advances against such Lender Group Expenses from time to time as DIP Agent and the Lenders shall reasonably request, incurred thereby in connection with: (i) DIP Agent's and each Lender's audit and investigation of each Debtor in connection with the preparation, negotiation, and execution of the Loan Documents and DIP Agent's periodic audits of the Debtors; (ii) the preparation, negotiation, execution and interpretation this Agreement, the other Loan Documents and any proposal letter or commitment letter issued in connection therewith and the making of the Revolving Loans hereunder; (iii) any amendment, modification or waiver of, consent with respect to, or termination of, any of the Loan Documents or administration of the Revolving Loans made pursuant hereto or its rights hereunder or thereunder; (iv) the creation, perfection or protection of the Liens under the Loan Documents (including, without limitation, any reasonable

*DIP Credit Agreement*

fees and expenses for local counsel in various jurisdictions); (v) costs and expenses incurred by DIP Agent in the disbursement of funds to Borrower or other members of the Lender Group (by wire transfer or otherwise); (vi) the ongoing administration of this Agreement and of the Revolving Loans, including consultation with attorneys in connection therewith and with respect to DIP Agent's rights and responsibilities hereunder and under the other Loan Documents; (vii) the protection, collection or enforcement of any of the Obligations or the enforcement of any of the Loan Documents; (viii) the commencement, defense or intervention in any court proceeding relating in any way to the Obligations, the Collateral, any Debtor, this Agreement or any of the other Loan Documents; (ix) the response to, and preparation for, any subpoena or request for document production with which DIP Agent is served or deposition or other proceeding in which DIP Agent is called to testify, in each case, relating in any way to the Obligations, the Collateral, any Debtor, this Agreement or any of the other Loan Documents; (x) any litigation, contest, dispute, suit, proceeding or action (whether instituted by DIP Agent, any Lender, Borrower, any Debtor or any other Person and whether as a party witness or otherwise) in any way relating to the Collateral, any of the Loan Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrower, any Debtor or any other Person that may be obligated to DIP Agent or any Lender by virtue of the Loan Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Obligations during the pendency of one or more Events of Default; (xi) any attempt to enforce (A) any Loan Document or Obligation or any security therefor or (B) any other right or remedy of DIP Agent or any Lender against Borrower, any Debtor or any other Person that may be obligated to DIP Agent or any Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Loan during the pendency of one or more Events of Default; (xii) any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or in any insolvency or bankruptcy proceeding during the pendency of one or more Events of Default; and (xiii) reasonable efforts to (A) monitor Borrower's uses of the proceeds of the Revolving Loans, (B) observe or assess any Debtor or their respective businesses, and (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral.

        (b)     Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: reasonable fees, costs and expenses of accountants, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; reasonable photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram or telecopy charges; reasonable secretarial overtime charges; and reasonable expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.

        (c)     The obligations of Borrower contained in this Section 11.5 shall survive payment or satisfaction in full of all other Obligations.

*DIP Credit Agreement*

**Section 11.6    No Waiver.**

Any failure or delay by DIP Agent or any Lender, at any time or times, to require strict performance by Borrower or Guarantor of any provision of this Agreement or any other Loan Document shall not waive, affect or diminish any right of DIP Agent or any Lender thereafter to demand strict compliance and performance herewith or therewith. Any suspension or waiver of an Event of Default shall not suspend, waive or affect any other Event of Default whether the same is prior or subsequent thereto and whether the same or of a different type. None of the undertakings, agreements, warranties, covenants and representations of Borrower and Guarantor contained in this Agreement or any of the other Loan Documents and no Default or Event of Default by Borrower or Guarantor shall be deemed to have been suspended or waived by DIP Agent or any Lender, unless such suspension or waiver is by a written instrument signed by an officer or other authorized employee of DIP Agent, DIP Agent and the applicable required Lenders, and directed to Borrower specifying such suspension or waiver.

**Section 11.7    Remedies.**

Each Agent's and each Lender's rights and remedies under this Agreement, the other Loan Documents, and all other agreements shall be cumulative and nonexclusive of any other rights and remedies which DIP Agent or any Lender may have under any other agreement, including without limitation the other Loan Documents, by operation of law or otherwise. The Lender Group shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity. No exercise by the Lender Group of one right or remedy shall be deemed an election.

**Section 11.8    Severability.**

Wherever possible, each provision of this Agreement and the other Loan Documents shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement or any other Loan Document shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement or such other Loan Document.

**Section 11.9    Conflict of Terms.**

Except as otherwise provided in this Agreement or any of the other Loan Documents by specific reference to the applicable provisions of this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in any of the other Loan Documents, the provision contained in this Agreement shall govern and control.

**Section 11.10  Confidentiality.**

Each Agent and Lender individually (and not jointly or jointly and severally) agrees that material, non-public information regarding Borrower, Guarantor and their respective Subsidiaries, their operations, assets, and existing and contemplated business plans shall be treated by DIP Agent and the Lenders in a confidential manner, and shall not be disclosed by

77                                                        *DIP Credit Agreement*

DIP Agent and the Lenders to Persons who are not parties to this Agreement, except:  (a) to attorneys for and other advisors, accountants, auditors, and consultants to any member of the Lender Group, (b) to Subsidiaries and Affiliates of any member of the Lender Group, provided that any such Subsidiary or Affiliate shall have agreed to receive such information hereunder subject to the terms of this <u>Section 11.10</u>, (c) as may be required by statute, decision, or judicial or administrative order, rule, or regulation, (d) as may be agreed to in advance by Borrower, Guarantor or their respective Subsidiaries or as requested or required by any Governmental Authority pursuant to any subpoena or other legal process, (e) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by DIP Agent or the Lenders), (f) in connection with any assignment, prospective assignment, sale, prospective sale, participation or prospective participations, or pledge or prospective pledge of any Lender's interest under this Agreement, provided that any such assignee, prospective assignee, purchaser, prospective purchaser, participant, prospective participant, pledgee, or prospective pledgee shall have agreed in writing to receive such information hereunder subject to the terms of this <u>Section 11.10</u>, and (g) in connection with any litigation or other adversary proceeding involving parties hereto which such litigation or adversary proceeding involves claims related to the rights or duties of such parties under this Agreement or the other Loan Documents.  The provisions of this <u>Section 11.10</u> shall survive for two (2) years after the payment in full of the Obligations.

**Section 11.11 GOVERNING LAW, CONSENT TO JURISDICTION AND SERVICE OF PROCESS; WAIVER OF JURY TRIAL.**

(a)    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ANY OF THE LOAN DOCUMENTS (AND IN ANY SUCH CASE, STRICTLY LIMITED TO THE EXTENT PROVIDED), IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THE LOAN DOCUMENTS AND THE OBLIGATIONS SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND INTENDED TO BE PERFORMED IN THAT STATE.

(b)    EACH OF THE PARTIES HERETO HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT, AND ANY COURT HAVING JURISDICTION OVER APPEALS OF MATTERS HEARD IN SUCH COURT, SHALL HAVE NON-EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN OR AMONG ANY OF THE PARTIES HERETO PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, <u>PROVIDED</u>, <u>HOWEVER</u>, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE ANY AGENT OR ANY LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF ANY AGENT OR ANY LENDER.  EACH DEBTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT. EACH PARTY HERETO

*DIP Credit Agreement*

HEREBY WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY OBJECTION WHICH SUCH PERSON MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR *FORUM NON CONVENIENS* AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

(c)      EACH PARTY HERETO HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND IRREVOCABLY CONSENTS AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINTS AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO THE PROCESS AGENT AT THE ADDRESS SET FORTH IN THIS SECTION 11.11 AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF THE PROCESS AGENT'S ACTUAL RECEIPT THEREOF OR FIVE (5) DAYS AFTER DEPOSIT IN THE UNITED STATES MAILS, PROPER POSTAGE PREPAID.

(d)      EACH PARTY HERETO HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS.      EACH PARTY HERETO REPRESENTS THAT IT HAS REVIEWED THIS WAIVER AND IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**Section 11.12  Notices.**

Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other parties, or whenever any of the parties desires to give or serve upon any other parties any communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be deemed to have been validly served, given or delivered (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid, (b) upon transmission, when sent by telecopy or other similar facsimile transmission (with such telecopy or facsimile promptly confirmed by delivery of a copy by personal delivery or United States Mail as otherwise provided in this Section 11.12), (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid, (d) upon confirmation of receipt, when sent by electronic mail, or (e) when delivered, if hand-delivered by messenger, all of which communications shall be addressed to the party to be notified and sent to the address or facsimile number indicated below or to such other address (or facsimile number) as may be substituted by notice given as herein provided.  The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.  Each Debtor acknowledges and

*DIP Credit Agreement*

agrees that notices sent by any member of the Lender Group in connection with the exercise of enforcement rights against Collateral under the provisions of the Code shall be deemed sent when deposited in the mail or personally delivered, or, where permitted by law, transmitted by telefacsimile or any other method set forth above.

Addresses for Notices:

to any Debtor:

Express Energy Services Operating, LP
3200 Southwest Freeway
Suite 2000
Houston, Texas 77027

Attention:  James Davis, CFO
Telephone: (713) 625-7400
Telecopy:  (713) 621-6405

with a copy (the delivery of which shall not constitute notice to the Debtors) to:

Weil, Gotshal & Manges LLP
700 Louisiana, Suite 1600
Houston, Texas 77002

Attention: Alfredo R. Pérez
Telephone: (713) 546-5040
Telecopy: (713) 224-9511

to DIP Agent and the Lenders:

ORIX Finance Corp.
1717 Main Street, Suite 1100
Dallas, TX 75201

Attention:  Theodore Thorp
Telephone:  (214) 237-2094
Telecopy:

with a copy (the delivery of which shall not constitute notice to DIP Agent or the Lenders or any of them) to:

Richards Kibbe & Orbe LLP
One World Financial Center
New York, New York 10281

*DIP Credit Agreement*

Attention: Joon Hong
Nicholas Whitney
Telephone:  (212) 530-1800
Telecopy:  (212) 530-1801

**Section 11.13  Section Titles.**

The Article titles, Section titles and Table of Contents contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

**Section 11.14  Counterparts; Effectiveness.**

(a)     This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile, electronic mail or other electronic method of transmission approved by DIP Agent shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile, electronic mail or such other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

(b)     This Agreement shall be binding and deemed effective when executed by Borrower, Guarantor, DIP Agent, and each Lender whose signature is provided for on the signature pages hereof.

**Section 11.15  USA PATRIOT Act.**

Each Lender that is subject to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**") hereby notifies Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow such Lender to identify Borrower in accordance with the Act.

**Section 11.16  Statements Required in Officer's Certificate.**

Each Officer's Certificate with respect to compliance with a condition or covenant provided for in this Agreement shall include: (a) a statement that the Person or Persons making such certificate or opinion has read such covenant or condition; (b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based; (c) a statement that, in the opinion of such Person or Persons, such Person or Persons has made such examination or investigation as is

*DIP Credit Agreement*

necessary to enable such Person or Persons to express an informed opinion as to whether or not such covenant or condition has been satisfied; and (d) a statement as to whether or not, in the opinion of such Person or Persons, such condition or covenant has been satisfied.

## Section 11.17   Reinstatement.

If the incurrence or payment of the Obligations by Borrower or any Guarantor or the transfer to the Lender Group of any property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (collectively, a "**Voidable Transfer**"), and if the Lender Group is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that the Lender Group is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys fees of the Lender Group related thereto, the liability of Borrower and Guarantor automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

## Section 11.18   Attorney-In-Fact.

(a)     Each Debtor hereby irrevocably appoints DIP Agent as its attorney-in-fact, coupled with an interest, with full authority in the place and stead of such Debtor, and in the name of such Debtor or otherwise, from time to time after the occurrence of and during the continuation of an Event of Default, in DIP Agent's discretion, to take any action and to execute any instrument which DIP Agent may reasonably deem necessary or advisable to accomplish the purpose of this Loan Agreement or any other Loan Document, including, without limitation, the following:   (i) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for monies due and to become due under or in respect of the Collateral; (ii) to receive, endorse, and collect (A) any Collections of any Debtor, (B) any instruments made payable to such Debtor representing any dividend, payment of principal, interest, redemption price, purchase price or other distribution or payment in respect of any Collateral, or (C) any other instruments, documents and chattel paper received in connection with this Agreement or any other Loan Document; (iii) to file any claims, or take any action or institute any proceedings which DIP Agent shall deem necessary or desirable for the collection of any Collections of any Debtor in the event that such Debtor shall fail to do so, or otherwise to enforce the rights of DIP Agent and the Lenders with respect to this Agreement and the other Loan Documents; (iv) to execute and/or file any Code financing statements, continuation statements, or other filing, and any amendment thereof, relating to the Collateral; (v) to give notice to any third parties which may be required to perfect DIP Agent 's Liens on the Collateral; (vi) to register, purchase, sell, assign, transfer, pledge or take any other action with respect to any Collateral in accordance with this Loan Agreement and the other Loan Documents; and (vii) to register, purchase, sell, assign, transfer, pledge, or take any other action with respect to, any Collateral in accordance with this Loan Agreement or, to the extent applicable, any other Loan Document.

(b)     DIP Agent may, from time to time, at its option, perform any act which Borrower or any other Debtor agrees hereunder to perform which Borrower or such other Debtor

*DIP Credit Agreement*

shall fail to perform, and DIP Agent may from time to time take any other action which DIP Agent deems reasonably necessary for the maintenance, preservation or protection of any of the rights granted to DIP Agent and the Lenders hereunder, subject to any express limitations set forth in the Loan Documents.

(c)     (i) The powers conferred on DIP Agent and the Lenders hereunder, other than the obligations expressly set forth in this Agreement or imposed by law, shall not impose upon DIP Agent or the Lenders any duty as to any Collateral, or any responsibility for (A) ascertaining or taking action with respect to any matters relative to any Collateral, whether or not any of DIP Agent or the Lenders have or are deemed to have knowledge of such matters, (B) taking any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral, (C) the safekeeping of any Collateral, (D) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (E) any diminution in the value thereof, or (F) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (ii) all risk of loss, damage, or destruction of the Collateral shall be borne by the Debtors.

## Section 11.19  Advice of Counsel.

Each of the parties hereto represents to each other party hereto that it has discussed this Agreement and each of the provisions, terms and conditions hereof, including, specifically, the provisions of Section 11.11, with its respective counsel.

## Section 11.20  No Strict Construction.

The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

[*Signature pages to follow*]

*DIP Credit Agreement*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

**Borrower:**

**EXPRESS ENERGY SERVICES OPERATING, LP**

By:_____
    Name:
    Title:

**Holdings:**

**EXPRESS ENERGY SERVICES (2008) LLC**

By:_____
    Name:
    Title:

**PARENT ENTITIES:**

**EXPRESS ENERGY SERVICES HOLDING, LP**

By:_____
    Name:
    Title:

**EXPRESS ENERGY SERVICES GP, LLC**

By:_____
    Name:
    Title:

*Signature Page to DIP Credit Agreement*

**Subsidiary Guarantors:**

**EXPRESS ENERGY SERVICES CT, LP,**
**EXRESS ENERGY SERVICES ARK, LP,**
**EXPRESS ENERGY SERVICES P&A, LP,**
**EXPRESS ENERGY SERVICES WL, LP,**

By:   Express Energy Services GP, LLC, as its
      general partner

By:   Express Energy Services (2008) LLC, as its
      sole member

By:   _____
      Name:
      Title:


**EXPRESS – BYRD R&S GP, LLC,**
**EXPRESS – MBCC GP, LLC,**
**EXPRESS – MIKE BYRD CASING CREWS**
**GP, LLC,**
**EXPRESS R&S TONG SERVICES GP, LLC,**
**EXPRESS BAH LEASING GP, LLC,**
**D&D TONGS GP, LLC,**
**EXPRESS – NORTH TRAIL OILFIELD**
**SERVICES GP, LLC,**
**EXPRESS – ACE RAT HOLE SERVICE GP,**
**LLC,**

By: Express Energy Services Operating, LP, as its
      sole member

By: Express Energy Services GP, LLC, as its
      general partner

By: Express Energy Services (2008) LLC, as its sole
      member

By:   _____
      Name:
      Title:


*Signature Page to DIP Credit Agreement*

**EXPRESS – BYRD R&S OILFIELD SERVICES, L.P.**

By: Express – Byrd R&S GP, LLC, as its general partner

By: Express Energy Services Operating, LP, as its sole member

By: Express Energy Services GP, LLC, as its general partner

By: Express Energy Services (2008) LLC, as its sole member

By: _____

    Name:
    Title:

**EXPRESS – MBCC, LTD.,**

By: Express – MBCC GP, LLC, as its general partner

By: Express Energy Services Operating, LP, as its sole member

By: Express Energy Services GP, LLC, as its general partner

By: Express Energy Services (2008) LLC, as its sole member

By: _____

    Name:
    Title:

**EXPRESS – MIKE BYRD CASING CREWS, LTD.**

By:Express Mike Byrd Casing Crews GP, LLC, as its general partner

By:Express Energy Services Operating, LP, as its sole member

By:Express Energy Services GP, LLC, as its general partner

By:Express Energy Services (2008) LLC, as its sole member

By:_____

    Name:
    Title:

**EXPRESS R&S TONG SERVICES, LTD.**

By:Express – R&S Tong Services, GP, LLC, as its general partner

By:Express Energy Services Operating, LP, as its sole member

By:Express Energy Services GP, LLC, as its general partner

By:Express Energy Services (2008) LLC, as its sole member

By:_____

    Name:
    Title:

*Signature Page to DIP Credit Agreement*

**EXPRESS – BAH LEASING, LTD.**

By: Express BAH Leasing GP, LLC, as its general
     partner

By: Express Energy Services Operating, LP, as its
     sole member

By: Express Energy Services GP, LLC, as its
     general partner

By: Express Energy Services (2008) LLC, as its sole
     member

By: _____

     Name:
     Title:

**D&D TONGS, L.P.**

By: D&D Tongs GP, LLC, as its general partner

By: Express Energy Services Operating, LP, as its
     sole member

By: Express Energy Services GP, LLC, as its
     general partner

By: Express Energy Services (2008) LLC, as its sole
     member

By: _____

     Name:
     Title:

*Signature Page to DIP Credit Agreement*

**EXPRESS – NORTH TRAIL OILFIELD SERVICES, LTD.**

By: Express – North Trail Oilfield Services GP, LLC, as its general partner

By: Express Energy Services Operating, LP, as its sole member

By: Express Energy Services GP, LLC, as its general partner

By: Express Energy Services (2008) LLC, as its sole member

By: _____

    Name:
    Title:

**EXPRESS – ACE RAT HOLE SERVICE, LTD.**

By: Express – Ace Rat Hole Service GP, LLC, as its general partner

By: Express Energy Services Operating, LP, as its sole member

By: Express Energy Services GP, LLC, as its general partner

By: Express Energy Services (2008) LLC, as its sole member

By: _____

    Name:
    Title:

*Signature Page to DIP Credit Agreement*

**ORIX FINANCE CORP.**, as DIP Agent and a
Lender


By: _____
      Name:   Christopher Smith
      Title:     Authorized Representative

*Signature Page to DIP Credit Agreement*

**[LENDERS**], as a Lender

By: _____
    Name:
    Title: